

**SO ORDERED.**

**SIGNED this 29 day of April, 2011.**

_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE

_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CENTRAL STATES MECHANICAL, INC. | ) | Case No. 09-12542 |
| | ) | Chapter 11 |
| Debtor. | ) | |
| ——————————————————————— | ) | |
| | ) | |
| CENTRAL STATES MECHANICAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Adversary No. 09-5155 |
| | ) | |
| AGRA INDUSTRIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————————————— | ) | |

## MEMORANDUM OPINION

1

## TABLE OF CONTENTS

I.    BACKGROUND FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A.    Bankruptcy of Debtor - Status of Chapter 11 plan . . . . . . . . . . . . . . . . . 6

B.    The Parties and Significant Players in the case . . . . . . . . . . . . . . . . . . . . 7

1.    Central States Mechanical, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . 7

2.    Sega, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

3.    Agra Industries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

4.    Delta-T Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

5.    Great Plains Renewable Energy . . . . . . . . . . . . . . . . . . . . . . . . . 8

6.    Plymouth Energy, LLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7.    Wanzek Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

C.    The Subcontracts Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1.    Superior Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

2.    Plymouth Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11


II.   SUMMARY OF CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

A.    Central's Breach of Contract Claims-Superior Project . . . . . . . . . . . . . 13

1.    Failure to Pay Contract Balance . . . . . . . . . . . . . . . . . . . . . . . . 13

2.    Failure to Pay for Extra Time and Expense Resulting

from Delay and Breach of Duty to Schedule and Supply . . . . . . 14

3.    Water Treatment Facility Work . . . . . . . . . . . . . . . . . . . . . . . . . 14

4.    Disputed Change Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

5.    Attorneys Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

B.    Agra's Defenses and Counterclaims-Superior Project . . . . . . . . . . . . . 15

1.    Failure to Satisfy Subcontract Conditions . . . . . . . . . . . . . . . . . 15

2.    Failure to Complete Subcontract Scope of Work . . . . . . . . . . . 15

3.    Setoff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

C.    Central's Breach of Contract Claims-Plymouth Project . . . . . . . . . . . . 15

2

          1.      Contract Breaches and Failure to Pay Delay Claims . . . . . . . . . . 15

          2.      Wrongful Termination of Agreement . . . . . . . . . . . . . . . . . . . . . . 16

          3.      Breach of Implied Covenant of Good Faith and Fair Dealing . . . 16

          4.      Quantum Meruit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

  D.      Agra's Defenses and Counterclaims-Plymouth Project . . . . . . . . . . . . . 16

          1.      Abandonment of Job . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

          2.      Cost to Cover Central's Scope of Work . . . . . . . . . . . . . . . . . . . 17

          3.      Failure to File Timely Delay Notices and Follow Change Order

               Process          . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17


III.    THE CONTRACTS        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

  A.      Superior Subcontract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

          1.      Generally       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

          2.      Elements of the Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

          3.      Cost of the Work and Substantial Completion . . . . . . . . . . . . . . 20

          4.      Change Order Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

          5.      Delay and Acceleration Provisions . . . . . . . . . . . . . . . . . . . . . . 23

          6.      Scheduling Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

          7.      Claims Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

  B.      Plymouth Subcontract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

          1.      Generally       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

          2.      Elements of the Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

          3.      Subcontract Sum and Substantial Completion Date . . . . . . . . . . 32

          4.      Agra's Duties and Obligations Toward Central . . . . . . . . . . . . . 32

          5.      Payment Applications and Progress Payments . . . . . . . . . . . . . 33

          6.      Suspension of the Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

          7.      Termination of the Subcontract . . . . . . . . . . . . . . . . . . . . . . . . . 37

          8.      Agra's "Cover" of Central's Scope of Work . . . . . . . . . . . . . . . 37

          9.      Delay Notices and Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

3

10.      Change Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

IV.     SUPERIOR PROJECT – FINDINGS AND CONCLUSIONS OF LAW  . . . . . 41

    A.     The Timeline        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

         1.     Delays and Central Delay Claims  . . . . . . . . . . . . . . . . . . . . . 42

         2.     Change Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

         3.     Manpower Issues and Acceleration . . . . . . . . . . . . . . . . . . . . . 47

         4.     Closing out the Superior Contract . . . . . . . . . . . . . . . . . . . . . 48

    B.     Water Treatment Plant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    C.     Findings Concerning Damages at Superior . . . . . . . . . . . . . . . . . . . . 54

    D.     Superior Analysis and Conclusions of Law . . . . . . . . . . . . . . . . . . . . 57

         1.     Remaining Unpaid GMP for Cost of the Work . . . . . . . . . . . . . 61

         2.     Superior Delay and Impact Claims  . . . . . . . . . . . . . . . . . . . . 63

              a.     Did Central comply with the delay claim and

                       change order process set out in the contract?  . . . . . . . . . 63

              b.     Non-EED Claims: Additional Costs of Acceleration

                       and Extended Duration  . . . . . . . . . . . . . . . . . . . . . . . . . 69

              c.     Acceleration Labor Costs . . . . . . . . . . . . . . . . . . . . . . . . . . 70

              d.     Extended Duration Overhead Costs . . . . . . . . . . . . . . . . . 71

              e.     Water Treatment Piping Costs . . . . . . . . . . . . . . . . . . . . . 71

              f.     Out-of-Sequence Costs  . . . . . . . . . . . . . . . . . . . . . . . . . 72

              g.     Did Agra breach the change order provisions and,

                       if it did, does that breach excuse Central's compliance

                       with them? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

              h.     Does Central's noncompliance with the claims and

                       change order process disqualify it from being

                       compensated on its impact claim? . . . . . . . . . . . . . . . . . . 77

         3.     Water Treatment Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

V.      PLYMOUTH PROJECT – FINDINGS AND CONCLUSIONS OF LAW   ... 85

    A.       Performance of the Plymouth Project ........................... 85

         1.      Delays        ........................................ 85

         2.      Change Orders ...................................... 89

         3.      Manning the Plymouth Project ......................... 90

         4.      Central's Payment Application No. 10 ................... 93

         5.      The "Walk-Off" ..................................... 99

         6.      Termination and Cover .............................. 102

         7.      Damages at Plymouth ............................... 103

    B.       Plymouth Analysis and Conclusions of Law .................... 106

         1.      Central's Payment Application No. 10 ................... 106

         2.      Central's Walk-off and Suspension ...................... 116

         3.      Agra's Damages ..................................... 120

         4.      Agra's Breaches and Central's Claims ................... 121

             a.      Demobilization ............................... 121

             b.      Pay App 10 .................................. 122

             c.      Unreimbursed Sales Tax ........................ 122

             d.      Value of the Contract ........................... 122

             e.      Delay Claim/Extended Duration .................. 123


VI.    SUMMARY                 ..................................... 125

    A.       Superior Project          ..................................... 125

    B.       Plymouth Project         ..................................... 126

    C.       Setoff               ..................................... 126

    D.       Attorney's Fees           ..................................... 127

    E.       Post-Trial Motions        ..................................... 128

    F.       Judgment             ..................................... 128

This adversary proceeding is a construction contract dispute between Central States Mechanical, Inc. ("Central"), the mechanical/piping subcontractor, and Agra Industries ("Agra"), the design/builder and contractor, related to two separate ethanol plants built in Merrill, Iowa and Superior, Iowa. The Court conducted a two week trial on the parties' claims in November 2010 and thereafter the parties submitted proposed findings of fact and conclusions of law.[1] After careful review of the record and the parties' submissions, the Court is now ready to rule.[2] The following opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.[3]

## I.    **BACKGROUND FACTS**

### A.    **Bankruptcy of Debtor - Status of Chapter 11 plan**

Central filed its chapter 11 petition in this Court on August 7, 2009. By the time of its filing, Central had ceased doing business and, once in chapter 11, proceeded to liquidate its tangible assets. Pursuant to the chapter 11 plan confirmed on April 27, 2010, what remained of Central's assets was conveyed at confirmation to a liquidating trust (Trust). Robert L. (Bobby) Myers, formerly secretary/treasurer of Central, is the liquidating trustee of the Trust and is hereby substituted as party plaintiff in this adversary proceeding in his trust capacity only. The principal remaining asset to be administered is Central's claim for damages against Agra for breach of construction contract.

---

[1] Central appeared at trial by its counsel Mikel Stout, Wyatt Hoch, and Francis Baalmann. Agra appeared at trial by its counsel Kevin Wolf, Sara Ackermann, and Thomas Lasater.

[2] At the close of Central's evidence, Agra orally moved for judgment. The Court deferred ruling on the motion pending the close of the evidence. The motion is DENIED.

[3] The Court has subject matter jurisdiction over this core proceeding and the parties consent to trial and entry of a final order by this Court.

6

Central filed this adversary proceeding to prosecute those claims. Agra answered, denying Central's claims and alleging its own counterclaims for breach of contract, and asserts that Central's contractual failings caused Agra damages well in excess of Central's claims against Agra.

## B. The Parties and Significant Players in the Case

### 1. Central States Mechanical, Inc. ("Central")

Central was the mechanical/piping subcontractor on two ethanol plant projects with Agra Industries – one in Superior, Iowa and one in Merrill, Iowa. It was responsible for fabricating and installing the piping, and for installation of certain equipment, instrumentation, vessels, and valves ordered and supplied by third parties. Central's home office is located in Ulysses, Kansas. Robert E. (Bob) Myers, is the president of Central. His son, Robert L. (Bobby) Myers, is the secretary/treasurer and was the Central principal primarily involved in these two subcontracts. Heather Clutter is Central's bookkeeper and was involved in corresponding with Agra, and submitting change orders and pay applications on behalf of Central. John Hill was Central's site superintendent on the Superior project. Dennis Ahlberg was Central's site superintendent at the Plymouth project.

### 2. Sega, Inc. ("Sega")

Central retained the services of Sega a Kansas City industrial engineering firm for design of the piping aspects of the ethanol plants, based upon Delta-T's process design. Sega's Brad Carver worked on the piping design on these two ethanol plant projects. Steve Wopata was Sega's project manager.

### 3. Agra Industries ("Agra")

Agra is a general construction contractor headquartered in Merrill, Wisconsin. Agra was the

7

design/builder for the two ethanol plants in Iowa. Agra is headquartered in Merrill, Wisconsin and has built a number of biofuel and ethanol plants, feed mills, seed processing facilities and grain handling facilities. Pat Hinner is the president of Agra. David Marcott is the vice president of administration for Agra. Marcott was responsible for administration of the subcontracts, including the payment application process and the change order process. Marcott testified at trial. Bob Shank is the project director for Agra. Shank testified at trial, primarily regarding the Superior Project at Superior, Iowa. Russ Wende was Agra's director of procurement. The Court received into evidence Wende's deposition testimony. Erick Soder was the former site superintendent for Agra on the Plymouth Project. Soder reported to the project manager. Soder testified via video deposition. Terry Chipman, and later Dave Burgess, were the project managers on the Superior plant. Burgess was the project manager on the Plymouth project. Burgess reported to Bob Shank. Burgess testified at trial, primarily on the Plymouth project.

### 4. Delta-T Corporation ("Delta-T")

Agra retained Delta-T as its engineering consultant to design the process for the ethanol plants. It was also responsible for procuring and delivering process equipment, vessels, valves, and other components for installation by Central.

### 5. Green Plains Renewable Energy ("GPRE")

GPRE was the owner of the Superior, Iowa ethanol plant and contracted with Agra for the design/build of the ethanol plant.

Scott Flynn, P.E. ("Flynn") was employed by Engineering and Construction Services ("ECS") and acted as the owner's representative on the Superior project, overseeing construction and progress on the Superior plant and reporting to GPRE.

8

### 6.     Plymouth Energy, LLC ("Plymouth Energy")

Plymouth Energy was the owner of the ethanol plant to be built in Merrill, Iowa and contracted with Agra for its construction.

### 7.     Wanzek Construction ("Wanzek")

Wanzek was the piping contractor who replaced Central at the Merrill, Iowa project and completed Central's scope of work. Wanzek's project superintendent, Craig Pumper, testified regarding Wanzek's work on the project.

### C.    <u>The Subcontracts Generally</u>

Prior to its bankruptcy, Central had been a mechanical subcontractor in its own right since 1993 and had been continuously involved in various subcontracting activities until its departure from the two jobs that form the basis of the disputes discussed in this opinion. Central did task-specific mechanical work in meat plants, ethanol plants, and oil and gas ventures. Mechanical contract work involves running piping and setting valves, fittings, controls, and other equipment that handles air and liquids. As Central grew, it performed ethanol-related mechanical services for ICM, a company based in Colwich, Kansas that designs and builds ethanol plants. Bobby Myers worked on various projects for ICM and it was there that he became acquainted with Bob Shank, who at the time was ICM's director of field operations.

After Shank left ICM and moved to Agra to become a project director, he contacted Central through Bobby Myers and invited bids on two 50 million gallon per year ethanol plants, one at Superior, Iowa and the other at Merrill, Iowa. The ethanol plants were nearly identical in technology and design. Delta-T provided the process design on both. Central bid to act as the lead

9

mechanical subcontractor on both projects.[4]  Agra awarded the mechanical/piping subcontracts to Central.

### 1.     Superior Project

On December 15, 2006, Agra and Central entered into a Standard Form of Agreement Between Contractor and Subcontractor (AIA Document A401-1997) for Central to perform the piping subcontract work on the Superior Project at Superior, Iowa (the "Superior Subcontract").[5] The Superior Subcontract incorporated the Terms and Conditions of the Prime Contract (AIA Document A141) between Agra and the owner (GPRE), which was attached to the Superior Subcontract.[6]

The Superior Subcontract obligated Central to provide the pipe-routing design to implement Delta-T's ethanol-process design, to provide and install materials for the piping system, and to set some vessels and most equipment provided by others.  The Superior Subcontract obligated Agra to pay Central the "Cost of the Work" plus a fee of 12%, up to a guaranteed maximum price ("GMP") of $11,898,368.00.  The GMP included a $250,000 contingency allowance for use by Central, with any unused amount of contingency reverting back to Agra upon completion of the work.  The Superior Subcontract originally provided for a substantial completion date of November 18, 2007.

---

[4]  Ex. 5 (Superior), Ex. 157 (Plymouth).

[5]  Ex. 3.

[6]  Ex. 4.  Although AIA Document A201 (General Conditions of the Contract for Construction) is also referenced in the subcontract A401 (*See* Ex. 3, § 1.2), neither party argued that it applied in the Superior Project; instead, AIA Document A141 contained the applicable Terms and Conditions, to the extent not inconsistent with the provisions of the subcontract AIA Document A401.

10

By approved change order, Central's substantial completion date was extended to January 11, 2008.[7] The substantial completion date was further revised and last extended to March 6, 2008 due to added scope to Central's work for piping the water treatment system.[8]

The initial process design drawings for the Superior project, P&ID, rev. 0, were issued by Delta-T on November 1, 2006.[9] Subsequent design changes were reflected in P&ID, rev. 1 dated April 4, 2007; P&ID, rev. 2 dated June 20, 2007; P&ID, rev. 3 dated January 14, 2008; and P&ID, rev. 4 dated May 12, 2008. As explained by Bob Shank, in a design-build project, the engineering (design) and construction run on parallel paths, and it is not uncommon to have many changes in the drawings during a project. The testimony at trial also indicated that not all changes to the P&IDs impacted all contractors' scope of work; nor did all changes to the P&IDs necessarily involve extensive changes to the plant process design.

### 2. Plymouth Project

On October 15, 2007, Agra and Central entered into Standard Form of Agreement Between Contractor and Subcontractor (AIA Document A401-1997) for Central to perform the piping

---

[7] Ex. 686, Change Order #2. The extension was due to a delay in receiving the contract.

[8] Ex. 686, Change Order #16 and #18.

[9] Ex. 260. The design drawings for the ethanol plant processes are referred to as the P&IDs, an acronym for Process and Instrument Drawings. The initial design drawings are indicated by P&ID, rev. 0. Subsequent design changes incorporated into the drawings are indicated by sequential revision numbers, such as P&ID, rev. 1, P&ID, rev. 2, etc. Subsequent revisions may change only one item in the design drawings that impacts upon other drawings or may encompass several changes to the design drawings. Changes on the P&IDs are indicated by a triangle with a number inside the triangle indicating the P&ID revision in which the change was made. The location of the areas of the plant affected by the revision is indicated by a "cloud" mark on the drawings.

11

subcontract work on the Plymouth Project at Merrill, Iowa (the "Plymouth Subcontract").[10] General Conditions of the Contract for Construction (AIA Document A201) governing the Prime Contract between Agra and the owner were incorporated into and governed the Plymouth Subcontract to the extent they did not conflict with the Plymouth Subcontract.[11] For purposes of interpretation of the General Conditions, "Architect" can be substituted with the word "Owner" as there is no separate "Architect" for the Plymouth Project.

Central's Plymouth scope of work included pipe rack design and installation, fabrication, design, and installation of piping system, and installation of certain equipment, vessels, and valves supplied by Delta-T.[12] The Plymouth Subcontract obligated Agra to pay Central a fixed Subcontract Sum of $13,305,530 (as adjusted by change order). The Court observes that even though Central substantially exceeded the GMP and schedule of values on Superior ($11,898,368) and undertook additional items in its scope of work on Plymouth (pipe racks), it agreed to a lump sum contract price on this project. The Court also notes that the parties entered into the Plymouth Subcontract at a time when the parties were coming off significant difficulties in carrying out the Superior Subcontract and their relations had deteriorated to a degree. It included many of the same terms and conditions from the Superior Subcontract.[13] The Plymouth Subcontract set forth a substantial

---

[10] Ex. 158.

[11] Ex. 159.

[12] Ex. 158, CSM-AGRA 000382-383, CSM-AGRA 000397-000405.

[13] The Court notes that the headings and titles of the numbered articles in each A401 Document are substantially similar up to Article 11. At that point, the subject headings and numbering depart. It appears to the Court that the subcontracts diverge at this point due to the varying method of payment to Central under each subcontract (Article 10 – Cost of the Work vs. Fixed Subcontract Sum). Articles 11- 15, in the Superior Subcontract all deal with or pertain to Central's Cost of the Work, and are not present in the Plymouth Subcontract. *Cf.* Ex. 158 v. Ex.

completion date of May 15, 2008. According to the change order log on the Plymouth Subcontract, the completion date was extended fourteen days to May 29, 2008.[14] It is undisputed that Central never achieved substantial completion of the Plymouth project because it walked off the job on July 7, 2008 leaving its scope of work unfinished.

The initial P&ID, rev. 0 for the Plymouth project was issued November 6, 2006.[15] Subsequent revisions were issued January 29, 2008 (P&ID, rev. 1) and June 2, 2008 (P&ID, rev. 2).

### III.   SUMMARY OF CLAIMS

#### A.   Central's Breach of Contract Claims – Superior Project

##### 1.   Failure to pay contract balance

Central is entitled to payment of its "Cost of the Work" (as defined in the subcontract) plus a fee of 12%, not to exceed the guaranteed maximum price (GMP). Central's Cost of the Work plus the fee was $19,376,802.[16] Because this amount exceeds the GMP, Central claim it is entitled to payment of the full GMP, which after adjustment for approved change orders, totaled $12,870,254.[17] Central concedes that Agra is entitled to credit for (I) $11,027,616 paid directly to Central; and (ii) $1,540,724 paid to Central's subcontractors and suppliers.[18] The unpaid balance of Central's

---

3.

[14] Ex. 595. Neither party acknowledged this extended completion date at trial and operated from the original substantial completion date of May 15, 2008.

[15] Ex. 261.

[16] Exs. 265-268.

[17] Ex. 264.

[18] The Court notes that Central contends Agra, after receiving substantiating documentation from Central's counsel, overpaid Central's subcontractor Diamond Insulation by $31,192. Ex. 274. If correct, this overpayment reduces the credit to which Agra is entitled. The

13

subcontract is therefore $301,914.

    2.    **Failure to pay for extra time and expense resulting from delay and breach of duty to schedule and supply**

Central claims impact damages totaling $1,136,608.[19] These include Central's costs incurred because valves and vessels were not timely procured or delivered by Agra/Delta-T for Central to install, its costs for accelerating its work at Bob Shank's order, and its costs for completing change order work.

### 3.    Water Treatment Facility Work

Central claims the additional costs it incurred in piping the water treatment facility at the behest of Agra and owner GPRE in excess of amounts allowed in two change orders. The total change order amounts are $319,529.[20] Central's work cost $562,064, leaving an unpaid difference of $242,535.[21]

### 4.    Disputed change orders

Central asserts a claim of $149,069 for extra piping work done at the behest of Agra but for which Agra refused to approve a change order. [22] This claim and the amount claimed in respect of the water treatment facility are factually based on Central's actual costs and legally based on Agra's having breached the contract, course of dealing, and on Central's right to recover under a common law theory of quantum meruit.

---

Diamond Insulation payment will be addressed in the conclusions of law.

[19] Exs. 264, 94.

[20] Change Order 16 and 18.

[21] Ex. 264.

[22] Ex. 264.

### 5. Attorneys Fees

Central requests attorneys' fees and expenses under the subcontract, but further requests an opportunity to document a request for such fees in the future should it prevail here.[23]

### B. Agra's Defenses and Counterclaims - Superior Project

### 1. Failure to satisfy subcontract conditions

Agra contends that Central failed to comply with the various contract conditions that govern change orders and delay claims and that nothing in Agra's conduct supports either a finding of breach or that the contract was orally modified. Therefore, Agra claims that it is not liable to pay for any of the work that was not covered by an approved change order, nor that it was unjustly enriched by Central's efforts.

### 2. Failure to complete subcontract scope of work

Agra further contends that it incurred expenses of $269,525 in repairing Central's work and these back charges offset Agra's liability to Central for payment of the full contract price.

### 3. Setoff

Agra also contends that the damages it incurred because of Central's demobilization and departure from the Plymouth project discussed below, should be offset against any liability the Court finds Agra has to Central on the Superior contract.

### C. Central's Breach of Contract Claims – Plymouth Project

### 1. Contract breaches and failure to pay delay claims

With respect to the Plymouth project, Central contends that it was unable to meet the substantial completion date of May 15, 2008 due to events or actions beyond its control and due to

---

[23] Ex. 4, § A.13.13.1, p. 41.

15

Agra breaches. Central contends that delayed predecessor activities, late procurement of valves, late scheduling changes and acceleration (moving up the grind-date and calling for extra work shifts), and late revisions to the P&IDs prevented it from timely performing its scope of work and/or caused additional costs to Central. Central cites to Agra's violation of contractual obligations under §§ 3.1.1 and 3.4.1.

### 2. Wrongful termination of agreement

Central contends that Agra wrongfully terminated the Plymouth Subcontract, because its default or breach in performing its scope of work was warranted by Agra's breach of the Subcontract. Central claims that it is entitled to be paid for the work it completed prior to its demobilization from the Plymouth site and Agra's termination.

### 3. Breach of Implied Covenant of Good Faith and Fair Dealing

Central asserts that Agra breached this duty when it rejected Central's payment application #10 and then turned around and billed the owner for Central's piping activities on application #10 that it had no intent of paying Central for. It contends that Agra's rejection was motivated, not by the accuracy of the completion percentage in the payment application, but driven by Central's unresolved impact claim on the Superior project that was the subject of the parties' May 12, 2008 meeting, and by Agra's own cash flow difficulties.

### 4. Quantum meruit

As an alternative to its damage claims for breach of contract, Central seeks recovery of the amount of its completed work under the doctrine of quantum meruit.

### D. Agra's Defenses and Counterclaims – Plymouth Project

### 1. Abandonment of job

16

Agra contends that it was justified in terminating the subcontract when Central walked off the job July 7, 2008 without completing its scope of work. It further contends that it properly complied with the subcontract's termination provisions, § 7.2.

### 2. Cost to cover Central's scope of work

Agra contends that under § 3.4 and § 7.2.1 of the Plymouth Subcontract it was entitled to complete Central's unfinished scope of work and deduct the reasonable cost thereof from the payments due Central. Here, Agra retained Wanzek to complete the piping job on the Plymouth Project, at a cost of $4,604,610, plus 15% for a total of $5,295,301.

### 3. Failure to file timely delay notices and follow change order process

Agra asserts that Central failed to make timely delay notices that would have excused Central's timely performance of its scope of work and that in their absence, Central is not entitled to recover. Agra asserts that Central failed to comply with the change order procedures and that it is not entitled to compensation for work that it may have performed outside its scope of work without an approved change order.

## III. THE CONTRACTS

### A. Superior Subcontract

#### 1. Generally

The Superior Subcontract obligated Central to provide the "[c]omplete pipe routing design, materials and installation of mechanical piping" according to its scope of work (which included installation of certain equipment, vessels, and valves supplied by Agra or Delta-T)[24] and the

---

[24] Ex. 3, CSM-AGRA 000700-701.

specifications and process-design supplied by Agra and Delta-T.[25]   The Superior Subcontract

included a construction schedule for Central's activities.[26]   Central was supposed to build the

Superior Project to the process line list ("line list"),[27] the site plan, and the rev. 0 P&IDs that were

provided at the time the Superior Subcontract was executed.

**2.     Elements of the Contract**

The "Subcontract Documents," were defined in Article 1 of the Superior Subcontract, as

follows:

> **§ 1.1**  The Subcontract Documents consist of (1) this Agreement; (2) the Prime
> Contract, consisting of the Agreement between the Owner and Contractor and the
> other Contract Documents enumerated therein; (3) Modifications issued
> subsequent to the execution of the Agreement between the Owner and Contractor,
> whether before or after the execution of this Agreement; (4) other documents listed
> in Article 21 of this Agreement; and (5) Modifications to this Subcontract issued
> after execution of this Agreement.  These form the Subcontract, and are as fully a
> part of the Subcontract as if attached to this Agreement or repeated herein. . . . An
> enumeration of the Subcontract Documents, other than Modifications issued
> subsequent to the execution of this Agreement, appears in Article 21.

Although § 1.2 identifies the General Conditions governing the Subcontract as the current edition

of AIA Document A201, General Conditions of the Contract for Construction, the parties do not

contend that it governs the Superior Subcontract; instead AIA Document A141, the Terms and

Conditions of the Prime Contract apply.[28]   Article 21 of the Subcontract indeed lists the Terms and

Conditions, AIA Document A141 ("Terms and Conditions")  among the documents comprising the

---

[25]  Ex. 3, § 8.1.

[26]  Ex. 3, CSM-AGRA 000761-769.

[27]  Ex. 3, CSM-AGRA 000721-000736.

[28]  *See* Note 6, *supra.*  Exhibit 4 is the referenced Terms and Conditions (AIA Document
A141.

18

Subcontract.

To the extent the Terms and Conditions did apply, Agra assumed toward Central all obligations and responsibilities that the owner under the Terms and Conditions assumed toward Agra, and Central assumed toward Agra all obligations and responsibilities which Agra under the Terms and Conditions assumed toward the owner.[29]  The Superior Subcontract makes clear that no contractual relationship is created between the Owner and the Subcontractor or any other parties other than Contractor and Subcontractor.[30]

As noted above, subsequent modifications of the Superior Subcontract become part of the Subcontract.  The Subcontract may be amended or modified only by a "Modification."[31]  Article 5 of the Superior Subcontract, which contains a reference to a "Modification," refers to changes in the work made by the Owner to the Prime Contract.[32]  In § 13.6.1, the Terms and Conditions refer to a Modification that must be effected in writing and signed by the party against whom the change is claimed or asserted, presumably Agra.

The Superior Subcontract contains an integration clause,[33] a time of the essence clause,[34] and incorporates anti-modification provisions from the Terms and Conditions.[35]

---

[29]  Ex. 3, § 2.1.

[30]  *Id.* at § 1.3.

[31]  *Id.* at § 1.3.

[32]  *Id.* at § 5.1.

[33]  Ex. 3, § 1.3.

[34]  Ex. 3, § 9.4.

[35]  Ex. 4, §§ 13.6.1 and A.13.4.2.

19

### 3.    Cost of the Work and Substantial Completion

The Superior Subcontract obligated Agra to pay Central the "Cost of the Work" plus a fee of 12%, up to a guaranteed maximum price ("GMP") of $11,898,368.00.  The GMP included a $250,000 contingency allowance for use by Central, with any unused amount of contingency reverting back to Agra upon completion of the work.[36]

The Superior Subcontract obligated Agra to make monthly progress payments to Central based on the value of the materials provided and the labor for the time period covered by each of Central's monthly pay applications. Payments were due within thirty days after Agra received Central's pay application at Agra's home office.  Interest accrued at a rate of 6% per annum on late progress payments.  Ten percent of each progress payment was to be held as retainage by Agra until Central obtained substantial completion of its work.[37]

The Superior Subcontract anticipated that Central would achieve substantial completion of its work no later than November 18, 2007 – a total duration of 339 calendar days from the date the agreement was executed.  The Superior Subcontract provided that Central's substantial completion date could be extended for any act of neglect or default by Agra and any "excusable event of delay," as that term was defined in the design/build contract between Agra and GPRE, by Central giving timely written notice of the delay.  Central waived its right to an extension of the subcontract time if it failed to give timely notice of the delay; § 3.4.1 required Central to give notice within 3 days of the occurrence that causes Central's performance to be delayed.[38]  A valid extension of the

---

[36] Ex. 3, § 10.1.

[37] Ex. 3, Art. 16 and Art. 20.

[38] Ex. 3, § 3.4.1.

20

subcontract required Agra's written consent to a delay claim submitted by Central in accordance with § 5.3 (*i.e.* an approved change order).[39] The substantial completion date on Superior was last extended to March 6, 2008. Agra was entitled to recover liquidated damages from Central of $5,000 per day for each day past November 18, 2007, as adjusted for time extensions granted, until substantial completion of the work.[40] Central, however, could only be assessed liquidated damages to the extent it, rather than a third party, caused the delays.[41]

### 4.    Change Order Provisions

Every provision of the Superior Subcontract that could be a contractual basis for Central being paid more than the GMP required Central to submit a written change order and to receive an approved change order. The Superior Subcontract provided that the cost of the work would not include any cost, other than cost included in change orders approved by Agra:

> **ARTICLE 12 COST NOT TO BE REIMBURSED**
> **§12.1** The Cost of the Work shall not include:
>
>              * * *
>
> **§12.1.8** Cost, other than cost included in Change Orders approved by the Contractor, that would cause the Guaranteed Maximum Price to be exceeded.[42]

The Superior Subcontract required that any changes in the payment amounts, additions or deletions to the work or changes to the completion date or any other material changes to the Superior

---

[39]  *See* Ex. 3, § 9.3 and § 9.5.

[40]  Ex. 3, § 9.3,

[41]  *Id.* at § 3.3.1.

[42]  Ex. 3, Art. 12. *See also,* Ex. 3, § 11.1 ("The Cost of the Work shall include only the items set forth in this Article 11."). Article 11 goes on to specify the costs to be reimbursed and includes: "Other cost incurred in the performance of the Work if and to the extent approved in advance in writing by the Contractor." Ex. 3, § 11.7.1.

Subcontract must be accomplished by change order, as follows:

### ARTICLE 5 CHANGES IN THE WORK
* * *

**§ 5.2** . . . The Subcontractor, <u>prior</u> to the commencement of such changed or revised Work, *shall submit promptly to the Contractor written copies of a claim for adjustment to the Subcontract Sum and Subcontract Time for such revised Work* in a manner consistent with requirements of the Subcontract Documents. *To change the materials or services which the Subcontractor is to provide the Contractor or the amount of compensation the Contractor is to pay the subcontractor or to change the completion date or the terms of this agreement, the Subcontractor is to provide a written Change Order (Change Order Forms attached to this agreement must be used) to the Contractor.* All such Change Orders must describe in detail the new services, materials and or equipment to be provided (or deleted) to the Contractor by the subcontractor. Also any added amounts (or reduction in amount) to be paid by the Contractor to The Subcontractor for the added materials and or services. The Change Order must include the payment terms (if different then [sic] this agreement) and any or all changes and or deletions to this agreement. *Any changes in the payment amounts, additions, deletions to the work or changes to the completion date or any other material changes to this agreement must be done by Change Order. . . .*[43]

Section 5.3 of the Superior Subcontract provided that any claims by Central for additional cost, extensions of time and damages for delays or other causes must be made in accordance with the Superior Subcontract documents, as follows:

**§ 5.3** The Subcontractor shall make all claims promptly to the Contractor for additional cost, extensions of time and damages for delays or other causes in accordance with the Subcontract Documents. A claim which will affect or become part of a claim which the Contractor is required to make under the Prime Contract within a specified time period or in a specified manner shall be made in sufficient time to permit the Contractor to satisfy the requirements of the Prime Contract. Such claims shall be received by the Contractor not less than two working days preceding the time by which the Contractor's claim must be made. Failure of the Subcontractor to make such a timely claim shall bind the Subcontractor to the same consequences as those to which the Contractor is bound.[44]

---

[43] Ex. 3 (emphasis added).

[44] *Id.*

22

All change orders were to be duly executed and authorized by Agra's project manager and one of Agra's officers.[45]  Agra was required under the Superior Subcontract to expedite written responses to change order requests and claims made by Central in accordance with Article 5.[46]

### 5.    Delay and Acceleration Provisions

Section A.8.3 of the Terms and Conditions applicable to the Superior Subcontract, entitled, "Excusable Events of Delay," provides:[47]

§ **A.8.3.1**  To the extent that any of the following events results in an actual delay in the progress of the Work and occurs because of events not within the [Subcontractor's] control, such delay shall, subject to compliance with the provisions of Paragraph 4.3.6 constitute an "Excusable Event of Delay:"

\* \* \*

§ **A.8.3.1.7**  Delays, up to a maximum of seventy-five (75) days, not caused by [Subcontractor], in the receipt of necessary materials or equipment.

§ **A.8.3.2**  Adverse weather conditions documented by data substantiating that weather conditions were abnormal for the period of time, could not have been reasonably anticipated, and had an adverse effect on the scheduled construction.

§ **A.8.3.2.1**  Any other delay not caused by [Subcontractor], [Subcontractor's] vendors or as otherwise set forth herein.

§ **A.8.3.3**  If the events of delay shall be an Excusable Event of Delay (as defined herein), the Construction Schedule, Milestone Dates or the date of Substantial Completion, as applicable, shall be modified by Change Order by the number of days which such events actually caused such dates or schedule to be extended after taking into consideration schedule float with respect to impacted activities and tasks on the most recent updated Construction Progress Schedule.

The subcontract likewise recognized that Central was entitled to an extension of time if the delay

---

[45]  Ex. 3 at § 5.2.

[46]  *Id.* at § 3.1.1.

[47]  Ex. 4.

23

was occasioned by an "excusable event of delay" as defined in the Terms and Conditions.[48]

Section A.4.1.7 of the Terms and Conditions addresses the process for making delay claims for additional time.[49] Section A.4.1.7.1 specifies that there shall be no changes in either the construction schedule or milestone dates without a change order. Claims regarding excusable events of delay must be made via a written delay notice and a delay claim, as follows:[50]

**§ A.4.1.7.2** Within seven (7) days after the occurrence of an Excusable Event of Delay, the [Subcontractor] shall submit a written notice (the "Delay Notice") to the [Contractor] properly labeled as a Delay Notice, which shall contain sufficient information to inform the [Contractor] of the occurrence of an Excusable Event of Delay. Such submission shall be a prerequisite to any changes in the Construction Schedule or Milestone Dates. The Construction Progress Schedule update required by Subparagraph A.3.10.3 or any other form of communication or notice shall not satisfy this obligation.

**§ A.4.1.7.3** Within fourteen (14) days after the occurrence of an Excusable Event of Delay, the [Subcontractor] shall submit a "Delay Claim." The Delay Claim shall set forth a detailed explanation for the delay, shall set forth the [Subcontractor's] programs for restoring the Work to the Construction Schedule and for mitigating any adverse effects of the projected delay. The Delay Claim shall also indicate the Modification requested by the [Subcontractor], if any, of the Construction Schedule or Milestone Dates. Each Delay Claim shall also indicate the reasons that the [Subcontractor] considers the delay to constitute an Excusable Event of Delay as defined in Paragraph A.8.3. [Subcontractor] shall make all reasonable efforts to minimize the effects of the delay and continue progress in areas of the work not affected by the Event of Delay.

If the subcontractor complies with the delay notice and delay claim provisions and the delaying event is an excusable event of delay, the construction schedule shall be modified by change order by the number of days which the delaying event causes the schedule to be extended.[51]

---

[48] Ex. 3, § 9.3.

[49] Ex. 4.

[50] *Id.*

[51] *Id.* at § A.4.1.7.4.

24

Section 5.3 of the Superior Subcontract provided that any claims by Central for damages or additional costs must be made to Agra in sufficient time to permit Agra to satisfy the requirements of the Prime Contract and not less than two working days before the time by which Agra's claim must be made to the owner.[52]  Section A.4.1.2 of the Terms and Conditions  addressed "Time Limits on Claims," providing;

> **§ A.4.1.2** …Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later.  Claims must be initiated by written notice to the other party.[53]

The process or procedure for making a claim for an increase in the GMP is set forth in § A.4.1.5:

> If the [Subcontractor] desires to make Claim for an increase in the Contract Sum or GMP, . . . written notice as provided herein shall be given before proceeding to execute the Work. . . . Any Claims as described herein shall be subject to the Change Order provisions set forth in Article A.7.[54]

Section A.4.1.5.1 states:

> There shall be no changes in the Contract Sum or GMP without a Change Order. Work performed by [Subcontractor] that exceeds the scope of work in the [Subcontract] without a Change Order shall be at the expense of [Subcontractor].[55]

Like the delay notice and delay claim for additional time, the subcontractor was obligated to give written notice of additional costs and submit an additional cost claim within the time limits set forth in the Terms and Conditions and any additional cost claims were subject to the change order

---

[52]  Ex. 3.

[53]  Ex. 4.  A "claim" is defined in § A.4.1.1 to include a demand for adjustment of the contract terms, payment of money, extension of time or other relief with respect to the terms of the contract.

[54]  Ex. 4.

[55]  *Id.*

25

process.[56]

With respect to acceleration, the Terms and Conditions contained an "acceleration of the work" provision that required Central, at no additional cost to Agra, to complete remaining work to meet the construction schedule.[57] The acceleration provision, however, only applied if something other than an "excusable event of delay" slowed or delayed Central's rate of progress. Therefore, the acceleration provision did not obligate Central to accelerate its work because of revisions in the process design drawings, changes and additions to the scope of its work, or late deliveries in vessels, equipment, and valves supplied by others.

### 6.    Scheduling Provisions

The Superior Subcontract incorporated a construction schedule that detailed the start dates, end dates, and durations of Central's work activities.[58] Through its bid documents, which were also incorporated into the Superior Subcontract, Central anticipated a 60 hour work-week with a peak workforce of 40 men.[59] It was required to submit to Agra a schedule of values that allocated the subcontract sum among the work of the subcontract.[60] Central was also required to complete and file a Daily Construction Report with Agra's project manager or site superintendent.[61]

Agra was responsible for scheduling and performing other work on the Superior site to avoid

---

[56] *See* Ex. 4, §§ A.4.1.5.2 , A.4.1.5.3, and A.4.1.5.4.

[57] Ex. 4 at § A.8.4.1

[58] *Id.* at § 21.1.4.

[59] *Id.* at § 8.1; Ex. 5, CSM-AGRA 008223.

[60] Ex. 3 at § 4.1.3.

[61] Ex. 3 at § 3.2.7.

26

conflicts and interference with Central's work. The Superior Subcontract obligated Agra promptly to notify Central when Agra became aware of information that would affect Central's work. Agra was also required to promptly notify Central of any changes in the construction schedules, submittal schedules, and additional scheduling details.[62]

### 7. Claims Provisions

A "claim" is defined in § A.4.1.1 of the Terms and Conditions to include a demand for adjustment of the contract terms, payment of money, extension of time or other relief with respect to the terms of the contract and is required to be initiated by written notice.[63] Section 5.3 of the Superior Subcontract obligated Central to promptly make all claims for additional costs, extensions of time, and damages for delays in accordance with the subcontract documents.[64] To the extent Central's claim would affect or become part of a claim which Agra was required to make under the prime contract, Central's claim must have been received by Agra not less than two working days preceding the time by which Agra's claim must be made. Failure of Central to make a timely claim bound Central to the same consequences as those to which Agra was bound. If Agra asserted a claim against the owner which related to Central's work, the Superior Subcontract required Agra to make available to Central information relating to the claim.[65] Until the claim is resolved, the parties are to continue with performance of the contract.[66]

---

[62] Ex. 3 at §§ 3.1.1 and 3.2.1

[63] Ex. 4.

[64] Ex. 3.

[65] Ex. 3, § 3.2.6.

[66] Ex. 4, § A.4.1.3 (Continuing performance of the contract while the claim is pending is not required where the Contractor has failed to make payment, § A.9.7.1 or Article A.14,

27

Section A.4.1.2 of Terms and Conditions applicable to the Superior Subcontract addressed

"Time Limits on Claims," providing;

> **§ A.4.1.2** …Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later. Claims must be initiated by written notice to the other party.[67]

The process or procedure for making a claim for an increase in the GMP is set forth in § A.4.1.5:

> If the [Subcontractor] desires to make Claim for an increase in the Contract Sum or GMP, . . . written notice as provided herein shall be given before proceeding to execute the Work. . . . Any Claims as described herein shall be subject to the Change Order provisions set forth in Article A.7.[68]

Section A.4.1.5.1 states:

> There shall be no changes in the Contract Sum or GMP without a Change Order. Work performed by [Subcontractor] that exceeds the scope of work in the [Subcontract] without a Change Order shall be at the expense of [Subcontractor].[69]

Like the delay notice and delay claim for additional time, the subcontractor was obligated to give

written notice of additional costs and submit an additional cost claim within the time limits set forth

in the Terms and Conditions and any additional cost claims were subject to the change order

process.[70]

Provided Central complied with the claims and change order process and procedures, Agra

was responsible to Central for additional costs incurred by Central because of excusable events of

---

termination of the contract.)

[67] Ex. 4.

[68] Ex. 4.

[69] *Id.*

[70] *See* Ex. 4, §§ A.4.1.5.2 , A.4.1.5.3, and A.4.1.5.4.

28

delay, delays caused by Agra or others and not caused by Central, changes in the work, and improperly timed activities.[71]

## B. Plymouth Subcontract

### 1. Generally

The Plymouth plant was virtually identical in technology and design to the Superior ethanol plant, and Agra utilized the same design contractor, Delta-T. Agra intended for the construction of the Plymouth plant to follow its "sister" plant at Superior by several months.[72] Central's scope of work on the Plymouth Project was substantially the same as the process piping work on the Superior Project, with the addition of pipe rack design, fabrication and installation.[73] Central was to build this project in accordance with the P&IDs, its scope of work, the equipment installation list, the line list, and the master schedule.[74]

### 2. Elements of the Contract

Similar to the Superior Subcontract, the Plymouth Subcontract is memorialized on a substantially similar form of AIA Document A401-1997.[75] Article 1 of the Plymouth Subcontract

---

[71] *See* Ex. 3, §§ 5.2, 5.3, 12.1.8; Ex. 4, §§ A.4.1.5.1, A.4.1.5.4, and A.6.2.3.

[72] Central's date of commencement under the Subcontract was the same as the date of the Subcontract - October 15, 2007, but the parties earlier signed a letter of intent on September 17, 2007 wherein Agra announced its intent to award the piping subcontract to Central and authorized Central to order materials and begin pipe fabrication before the Subcontract was signed. *See* Ex. 167, CSM-AGRA 991709.

[73] Ex. 158, CSM-AGRA 000382-383, CSM-AGRA 000397-000405. *Cf.* Scope of Work - Superior, Ex. 3 at CSM-AGR 000700-701 with Scope of Work - Plymouth, Ex. 158 at CSM-AGR 000382-383.

[74] Ex. 158, CSM-AGRA 000414-415, CSM-AGRA 000419-000427. *See also,* Ex. 158, § 8.1.

[75] Ex. 158.

29

defined the "Subcontract Documents," as follows:[76]

> **§ 1.1** The Subcontract Documents consist of (1) this Agreement; (2) other documents listed in Article 16 of this Agreement; and 3) Modifications to this Subcontract issued after execution of this Agreement. These form the Subcontract, and are as fully a part of the Subcontract as if attached to this Agreement or repeated herein. . . . An enumeration of the Subcontract Documents, other than Modifications issued subsequent to the execution of this Agreement, appears in Article 16.[77]

> **§ 1.2** Except to the extent of a conflict with a specific term or condition contained in the Subcontract Documents, the General Conditions governing this Subcontract shall be the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.[78]

To the extent the General Conditions (AIA Document A201) apply, Agra assumed toward Central all obligations and responsibilities that the owner under the General Conditions assumed toward the Contractor and Central assumed toward Agra all obligations that the Contractor assumed toward the owner and architect.[79] The Plymouth Subcontract makes clear that no contractual relationship is created between the Owner and the Subcontractor or any other parties other than the Contractor and Subcontractor.[80] For purposes of interpretation of the Plymouth Prime Contract, "Architect" can be substituted with the word "Owner" as there is no separate "Architect" for the Plymouth Project.

---

[76] *Id.*

[77] Article 16 of the Plymouth Subcontract enumerates the Subcontract Documents as follows: an executed AIA Document A401-1997 [the Subcontract]; the Prime Contract between the Owner and the Contractor and other contract documents enumerated therein; and Other Documents listed – Agra's Labor Rates, Sample Forms, Application for Payment, Schedule of Values, Lien Waiver, Change Order and Site Approval Forms, Agra's Safety Policy, and Agra's Drug and Alcohol Policy. Ex. 158, §§ 16.1.1, 16.1.2, and 16.1.4.

[78] Ex. 159 sets forth the General Conditions of the Contract for Construction, AIA Document A201 (hereafter "General Conditions").

[79] Ex. 158, § 2.1.

[80] *Id.* at § 1.3.

30

As noted above, the Plymouth Subcontract could not be altered except by a subsequent Modification of the Plymouth Subcontract.[81]  The General Conditions define a Modification as follows:

> (1) a written amendment to the Contract signed by both parties, (2) a Change Order, (3) a Construction Change Directive or (4) a written order for a minor change in the Work issued by the Architect.[82]

In short, a Modification to the Plymouth Subcontract must be in writing and signed by the appropriate parties to be effective.[83]

Like the Superior Subcontract, the Plymouth Subcontract contained an integration clause,[84] a time of the essence clause,[85] and incorporated anti-waiver provisions.[86]

The Court notes that several provisions in the Plymouth Subcontract are similar to the Superior Contract and will not be fully set forth again here.  The Court instead will focus its summary of other key contractual provisions in the Plymouth Subcontract and General Conditions, to those pertinent to the events that transpired on the Plymouth project.

---

[81] *Id.*

[82] Ex. 159, § 1.1.1.

[83] The General Conditions indicate that a Construction Change Directive is a written order signed by the Owner, § 7.3.1 and a Change Order is a written instrument signed by the Owner [Contractor] and Contractor [Subcontractor], § 7.2.1.

[84] Ex. 158, § 1.1.  *See also,* § 1.3 which provides that the Subcontract could be amended or modified only by a Modification and Ex. 159, § 1.1.2 for the integration clause in the General Conditions.

[85] Ex. 158, § 9.4.

[86] Ex. 159, § 13.4.2.

31

### 3.    Subcontract Sum and Substantial Completion Date

The Plymouth Subcontract dated October 15, 2007 obligated Agra to pay Central a fixed subcontract sum of $13,055,305 (as adjusted by change order), and established a substantial completion date of May 15, 2008.[87]   Central obtained approved change orders from Agra which increased the Subcontract Sum of the Plymouth Subcontract to $13,073,687, including one change order in June of 2008 related to valves that were not available at the time of original installation.[88] No extension of time to the substantial completion date was valid without an approved change order.[89]  According to the Plymouth change order log, the substantial completion date was extended 14 days, to May 29, 2008.[90]

### 4.    Agra's Duties and Obligations Toward Central

The Plymouth Subcontract imposed a number of obligations upon Agra in the performance of the subcontract: (1) a duty to cooperate with Central in scheduling and performing its work to avoid conflicts or interference with Central's work;[91] (2) a duty to expedite written responses to Central's claims and change orders;[92] (3) a duty to provide Central with the construction schedule

---

[87]  Ex. 158, § 10.1 and § 9.3.

[88]  Ex. 595-96.

[89]  Ex. 158, § 9.5.  *See also,* §§ 5.3 and 5.2.

[90]  The change order log, Ex. 595 reflects  approved change orders extending the completion date by "14 days" but at trial, neither Agra nor Central recognized a substantial completion date other than May 15, 2008.

[91]  Ex. 158, § 3.1.1.

[92]  *Id.*

32

and promptly notify Central of later changes to the schedule;[93] (4) a duty to make available to Central, information received from Plymouth Energy affecting Central's work;[94] and (5) if it makes a claim against Plymouth Energy relating to Central's work, a duty to make that information available to Central.[95]

### 5.        Payment Applications and Progress Payments

Similar to the Superior Subcontract, the Plymouth Subcontract obligated Agra to make monthly progress payments to Central during the contract time.[96]  Unlike at Superior, Central's monthly pay applications on Plymouth were based upon a percentage completion – the amount of work completed during the month expressed as a percentage of the whole.[97]  The $13 million subcontract price was divided into 36 work activities in an agreed upon "schedule of values."[98] Each activity was given a value and in the aggregate, those values equaled the Subcontract sum.[99] The schedule of values was to be attached to the pay application and show the percentage of work completed for each work activity.[100]  The schedule of values, unless objected to by Agra, was to be

---

[93] *Id.*

[94] *Id.* at § 3.2.1.

[95] *Id.* at § 3.2.6.

[96] Ex. 158, § 11.1.

[97] *Id.* at § 11.6.

[98] *See* Ex. 158, CSM-AGRA 000414-415

[99] *Id.* at § 11.5.

[100] *Id.* at §§ 11.5 and 11.6. *See e.g.,* Ex. 288.

the basis for reviewing Central pay applications.[101] In general, the amount of the progress payment was calculated by multiplying the percentage completion of each work activity for the month times the subcontract sum allocated to that work activity in the schedule of values and subtracting a 10% retainage from the completed work to date, together with other potential adjustments.[102]

Agra had 10 days from receipt of a pay application to partially or fully reject the application or it waived its right to reject the application of payment.[103] Agra was required to provide written notice to Central of its disapproval of a pay application.[104] Under the General Conditions, payment applications shall be "supported by such data substantiating the [Subcontractor's] right to payment as the [Contractor] may require . . ."[105] The General Conditions further contemplate that a certificate for payment would issue upon approval of the payment application or the amount properly due under the application.[106] Specifically, the General Conditions provide, in relevant part:

> **§ 9.4.2.** The issuance of a Certificate for Payment will constitute a representation by the [Contractor], based on . . . evaluation of the Work and the data comprising the Application for Payment, that the Work has progressed to the point indicated and that, to the best of the [Contractor's] knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents. . . . The issuance of a Certificate for Payment will further constitute a representation that the [Subcontractor] is entitled to payment in the amount certified.[107]

_____

[101] Ex. 158, § 11.5. Payments were to be withheld for pay applications not duly executed and with proper documentation attached. § 11.6.

[102] *Id.* at § 11.7.

[103] *Id.* at § 11.6.

[104] *Id.* at § 11.8.

[105] Ex. 159, § 9.3.1.

[106] *Id.* at § 9.4.1.

[107] Ex. 159.

34

If the parties cannot agree on the percentage completion set forth in the payment application, approval of the application or issuance of a certificate for payment may be withheld.

> **§ 9.5.1** The [Contractor] may withhold a Certificate for Payment in whole or in part, . . . if in the [Contractor's] opinion the representations . . . required by Section 9.4.2 cannot be made. . . [108]

When the reasons for withholding a certificate for payment have been resolved, certification is to be made for amounts previously withheld.[109] The Contractor could request that the subcontractor substantiate its completion percentage. The Contractor is not limited to a review of the pay application documents submitted by the subcontractor in deciding whether to approve an application.

> Section 11.3 of the Plymouth Subcontract described terms of payment, as follows:
>
> Provided an application for payment is received by the Contractor not later than the 5th day of a month, the Contractor shall include the Subcontractor's Work covered by that application in the next application for payment which the Contractor is entitled to submit to the Owner. The Contractor shall pay the Subcontractor each progress payment within three working days after the Contractor receives payment from the Owner. If the Owner does not issue a certificate for payment or the Contractor does not receive payment for any cause which is not the fault of the Subcontractor, the Contractor shall pay the Subcontractor, on demand, a progress payment computed as provided in Sections 11.7, 11.8 and 11.9. . . .

Section 11.3 was modified by the following handwritten sentence interlineated at the end of § 11.3: "On no Terms will payment be beyond Net 45 days [sic]."[110] The Court's interpretation of this handwritten modification when read with the rest of § 11.3 is that payment was intended to be due from Agra within 45 days, even if the owner did not certify payment to Agra or did not pay Agra for any cause not attributable to Central. The agreement does not state when the 45 days for Agra

---

[108] *Id.*

[109] *Id.* at § 9.5.2.

[110] Ex. 158 at § 11.3.

35

to make a payment began to run. Possible readings include running the time from the date of demand, the date of the pay application or the date Agra certified payment. Because Agra could withhold payment for applications not certified for payment, the Court concludes that the 45 days ran from the time payment was certified by Agra.

Agra could not bill the owner for amounts that it did not intend to pay Central and the General Conditions, consistent with § 11.3 of the Plymouth Subcontract, contemplated that Agra would pay Central upon Agra's receipt of payment from the owner on Agra's pay application to the owner.[111] Like Superior, amounts unpaid under the Plymouth Subcontract accrued interest at the rate of 6% per annum.[112]

### 6.    Suspension of the Work

Article 7 of the Plymouth Subcontract contains the only provisions specifically dealing with suspension of work. Section 7.3 recognizes the right of the *contractor* to suspend the subcontractor's work, without cause.[113] Nothing in Article 7 gives the subcontractor the right to "suspend" its work for any reason.

Article 4 of the Plymouth Subcontract sets forth the various obligations and rights of the subcontractor. Section 4.7.1 contains a reference to the subcontractor's right to "stop the Work" of the Subcontract:

> If the Contractor does not pay the Subcontractor *through no fault of the Subcontractor*, within seven days from the time payment should be made as provided in this Agreement, the Subcontractor may, without prejudice to any other available remedies, upon seven additional days' written notice to the Contractor, stop the

---

[111]  Ex. 159, §§ 9.3.1.2 and 9.6.2.

[112]  Ex. 158, § 15.2.

[113]  Ex. 158, § 7.3.1.

36

Work of this Subcontract until payment of the amount owing has been received. The Subcontract Sum shall, by appropriate adjustment, be increased by the amount of the Subcontractor's reasonable costs of demobilization, delay and remobilization.[114]

Apart from nonpayment, the Plymouth Subcontract delineates no other events or occurrences for which the subcontractor may stop or "suspend" its work.

### 7.    Termination of the Subcontract

The Plymouth Subcontract termination provisions are found in Article 7. Section 7.1.1 addresses termination by the subcontractor. Section 7.2.1 speaks to termination of the Subcontract by the contractor, as follows:

> If the Subcontractor persistently or repeatedly fails or neglects to carry out the Work in accordance with the Subcontract Documents or otherwise to perform in accordance with this Subcontract and fails within seven days after receipt of written notice to commence and continue correction of such default or neglect with diligence and promptness, the Contractor may, after seven days following receipt by the Subcontractor of an additional written notice and without prejudice to any other remedy the Contractor may have, terminate the Subcontract and finish the Subcontractor's Work by whatever method the Contractor may deem expedient. If the unpaid balance of the Subcontract Sum exceeds the expense of finishing the Subcontractor's Work and other damages incurred by the Contractor and not expressly waived, such excess shall be paid to the Subcontractor. If such expense and damages exceed such unpaid balance, the Subcontractor shall pay the difference to the Contractor.[115]

### 8.    Agra's "Cover" of Central's Scope of Work

Section 3.4 of the Plymouth Subcontract sets forth the contractor's remedies.

> **§ 3.4.1** If the Subcontractor defaults or neglects to carry out the Work in accordance with this Agreement and fails within three working days after receipt of written notice from the Contractor to commence and continue correction of such default or neglect with diligence and promptness, the Contractor, may, after three days following receipt by the Subcontractor of an additional written notice, and without

---

[114]  Ex. 158, § 4.7.1.

[115]  Ex. 158, § 7.2.1.

37

prejudice to any other remedy the Contractor may have, make good such deficiencies and may deduct the reasonable cost thereof from the payments then or thereafter due the Subcontractor. The Subcontractor shall not be in default if such failure is due to: . . . any neglect or default by Agra, or the Owner or Tenants of the jobsite. . . . If for any reason the Contractor should have to complete the Subcontractor's obligation(s) under this agree [sic], the Contractor shall charge the Subcontractor according to Agra's labor rate, attached to this agreement as "Exhibit A". If Agra should have to hire a different Subcontractor to complete the Work, Agra will charge the defaulting Subcontractor at a rate of cost plus 15% Contractors fee. The fore going does not relieve the Subcontractor from liquated [sic] damages in 9.3.[116]

Also, as noted in the termination provision above, § 7.2.1 authorized the contractor to "finish the Subcontractor's Work by whatever method the Contractor may deem expedient," where the subcontractor fails to perform its work, and to recover those costs and expenses from the subcontractor.

### 9.    Delay Notices and Claims

Central was obligated under the Subcontract to give a three (3) day written notice of occurrences of delay caused by Agra or Plymouth Energy in order to extend its time to perform the work.

§ 3.4.1. . . . Should the Subcontractor contend that any act of neglect or delay by Agra, or the Owner . . . has caused the Subcontractor to experience a delay in the performance of the Subcontractor's obligations under this agreement the Subcontractor shall give written *notice* and must be received at Agra's principle place of business of the occurrence(s) of delay and the reason for such delay within three (3) days after the commencement of such delay, or within three (3) days the Subcontractor first reasonably discovers the delay whichever occurs first. *Failure to give timely notice shall be deemed to waive extension of time for the Subcontractor to perform its obligation(s) under this agreement.*[117]

§ 9.5 No extension of time will be valid without the Contractor's written consent *after claim made by the Subcontractor in accordance with Section 5.3* [*i.e.* a change

---

[116] Ex. 158, § 3.4.1.

[117] *Id.*

38

order].[118]

Section 8.3 of the Plymouth General Conditions addresses delays.[119] Section 8.3.1 deals with delays "caused by an act or neglect of the [Contractor] . . ., or of an employee of [Contractor], . . . or by changes ordered in the Work . . . or other causes beyond the [Subcontractor's] control" which warrants an extension of the contract time [by change order]. Delay *claims* relating to time are governed by Plymouth General Conditions § 4.3.7.1. Claims seeking additional costs or to increase the Subcontract Sum, are governed by Plymouth General Conditions §§ 4.3.5 and 4.3.6.

Generally, claims must be initiated in writing within 21 days of the occurrence of the event giving rise to the claim.[120] The [Subcontractor] is to proceed "diligently with performance" of the subcontract work pending final resolution of the claim, and the [Contractor] is to continue making payments in accordance with the contract documents.[121] The party making the claim has the burden of substantiating its claim.[122]

### 10.    Change Orders

The Plymouth Subcontract could not be altered or modified except by a written Modification.[123] Under the Plymouth General Conditions, a change order is a Modification to the

---

[118]  Ex. 158.

[119]  Ex. 159.

[120]  Ex. 159, § 4.3.2.

[121]  *Id.* at § 4.3.3.

[122]  *Id.* at § 4.3.1.  A "claim" is defined as a demand or assertion by the claimant for "adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract." *Id.*

[123]  Ex. 158, § 1.3.

39

Subcontract and is required to be in writing.[124]  A change order was defined as a written instrument signed by the parties that changes the work, the contract sum or amount, or the contract time.[125]

The change order process prescribed in the Plymouth Subcontract was nearly identical to that in the Superior Subcontract.[126]  Section 5.2 provided that an executed change order was required to change the contract sum, contract time, or scope of work.  The Plymouth Subcontract did differ from Superior with respect to Agra's authorization of change orders.  Change orders having a value of less than $10,000 required the signatures of Agra's Project Manager and one Agra officer; change orders having a value of $10,000 or more required the signatures of Agra's Project Manager and two Agra officers.[127]  Section 5.3 obligated Central to promptly make all claims for additional costs, extensions of time, and damages for delays in accordance with the subcontract documents.  To the extent Central's claim would affect or become part of a claim which Agra was required to make to the owner under the prime contract, Central's claim must have been received by Agra not less than two working days preceding the time by which Agra's claim had to be made.  Agra was required to expedite written responses to change order requests and claims made by Central in accordance with Article 5.[128]  Agra was responsible for costs incurred by Central because of delays, improperly timed activities, damage to the work or defective construction of a separate contractor, subject to the

---

[124]  Ex. 159, § 1.1.

[125]  *Id.* at § 7.2.1.

[126]  *See* Ex. 158, §§ 5.2 and 5.3.

[127]  Ex. 158, § 5.2.  Recall that on the Superior project, all change orders, regardless of value, required the signatures of Agra's Project Manager and one Agra officer. Ex. 3, § 5.2.

[128]  Ex. 158, § 3.1.1.

40

change order process outlined above.[129]

## IV. SUPERIOR PROJECT – FINDINGS AND CONCLUSIONS OF LAW

### A. The Timeline

Central's claims concerning Superior have two elements. First, Central asserts that Agra breached the contract documents in various ways. It asserts that Agra failed to cooperate with Central and keep it informed of schedule changes and parts availability issues. It argues that Agra's designer, Delta-T, continually revised the technology drawings that Central was contracted to follow and that Delta-T repeatedly failed to supply valves and vessels that were necessary for Central to complete its work. Agra did not follow the change order and claims procedures set out in the contract, nor did it timely respond to valid claims made by Central in the course of the project. Second, Central argues that Agra's negative conduct as a counter-party amounted to a continuing breach of the implied covenant of good faith and fair dealing that underlies every contract, justifying Central in claiming damages for work done outside the change order and claim processes even if Agra succeeded in convincing the Court that the procedural requirements of the agreement were not met by Central.

Agra's project director Bob Shank solicited Bobby Myers for Central's bid on the Superior project in the Summer of 2006 as result of the relationship the two had developed on ICM projects. Before this, Central had never been a prime mechanical subcontractor on a project, nor had it been employed under an AIA form contract of the kind utilized here. Central's prior work for ICM had all been done on a purchase order basis. ICM acted as a design-builder of ethanol plants and maintained its own proprietary ethanol plant design, creating and executing its own technology.

---

[129] Ex. 159, § 6.2.3

41

By contrast, Agra contracted the technology and design to an independent company, Delta-T, over whom Agra apparently had no control and whose continual failure to perform played a prominent role in what happened in this case. Delta-T was the "elephant in the room" that was the source of both Central's and Agra's consternation on these ethanol plant construction projects.

### 1. Delays and Central Delay Claims

In November of 2006, Delta-T issued its first set of technical pipe drawings to Agra. These drawings (P&IDs) are incorporated by reference into the Superior Contract and were the basis for Central's bid.[130] On December 15, 2006 Central and Agra signed the Superior Subcontract which called for a substantial completion date of November 18, 2007.[131] After the Superior Subcontract was executed, Central ordered material and commenced shop fabrication work at its Ulysses facility. It immediately encountered delays because Delta-T's cut-sheet drawings for key components were not timely delivered to Central or Sega. Agra knew that if valves and equipment were delivered late there would be an impact on the construction at the Superior site and could delay completion.[132]

On March 29, 2007, the completion date was extended to January 11, 2008 upon approval of Change Order 2, due to a delay in execution of the prime contract between Agra and the owner, GPRE.[133] On April 4, 2007, Delta-T revised the P&IDs (rev. 1), making numerous changes to them.[134] Central mobilized to Superior, Iowa on May 14, 2007 to begin its work on the site. On

---

[130] Ex. 260.

[131] Ex. 3, § 9.3.

[132] At the end of the Superior Project, Agra calculated the impact at 1,888 days and asserted a $9.244 Million claim against Delta-T for late deliveries. Ex. 118.

[133] Ex. 686.

[134] Ex. 260.

June 20, 2007, Delta-T issued P&ID, rev. 2, again with numerous changes.[135] Superior's representative, Scott Flynn, testified that timely equipment and valve deliveries were critical for the construction schedule at Superior, and that the late delivery of valves and equipment impacted Central's ability to finish their work.[136] Late valve and equipment deliveries forced Central to "block out" numerous valve locations in piping runs. The block-out process made impossible the completion of many piping runs and severely impacted Central's productivity. Agra's own records confirmed this. Agra's weekly construction meeting minutes and other project documents reflect that Central was delayed in the spring and summer of 2007 as a result of: (I) a lack of angle iron delivery for pipe racks; (ii) late delivery of tank materials to the site; (iii) Delta-T's failure to timely furnish valve cut sheets; and (iv) late delivery of valves and other equipment.[137] The weekly reports also confirm that this delay continued unabated through the Fall and Winter of 2007.

Central asserts that its work was delayed by the unavailability of valves and vessels from June 25, 2007 to March 10, 2008. Central argues that this delay resulted from the need to "block" out missing valves. Indeed, the project was beset by delays; Agra filed a delay claim against Delta T for more than 1,888 days of delay that resulted from Delta-T's late or missed performance. Yet, it appears that of the approximate 1700 valves necessary to complete Central's scope of work, only 262 were missing.

Nearly a year into the Superior Project, as Bobby Myers grew more concerned about the economic consequences of delay caused by a lack of supply of valves and equipment and continuing

---

[135] *Id.*

[136] Agra Procurement Director Russ Wende testified that Delta-T failed "badly" at meeting the delivery dates for equipment on the Superior Project.

[137] Ex. 7, 8, 10.

43

revisions to the drawings, he inquired of both Shank and project director Terry Chipman how to submit a delay claim. They encouraged him to document his claims and, on November 1, 2007, Chipman e-mailed Myers an example of a delay claim that Agra had sent to GPRE.[138] Myers used this form to prepare and submit delay claims to Agra for missing valves and equipment.[139] On November 6, he sent Agra a 36-page list of valves that were missing from inventory and a delay claim of the same date.[140] On November 7 and 8, Central sent six additional delay claims to Agra for missing vessels, equipment and valves.[141] Central sought both an extension of the substantial completion date as well as overhead costs for the number of days delayed. The delaying event described in each of these delay claims occurred more than 21 days prior to the date of the delay claim letters.

In January of 2008, some additional days were added to the contract term for Central's added piping work on the water treatment system. This extended the substantial completion date to March 6, 2008.[142] Myers continued to document delay problems. In January of 2008, he sent Shank a letter outlining how many Central man-hours had been expended to date and what he anticipated remained necessary to complete the project. On March 13, 2008, he sent Agra a list of items that delayed Central's work in the DDE area of the plant.

---

[138] Ex. 38.

[139] Ex. 589.

[140] Ex. 40-41

[141] Ex. 589.

[142] Ex. 686. The Court notes that the change order log added 39 days to the completion date for the water treatment system piping, but 39 days added to the then completion date of January 11, 2008 does not calculate to March 6. In any event, the parties have recognized March 6, 2008 as the last extended substantial complete date on the Superior Project.

44

Central sent more delay claims to Agra in March and April of 2008 for: (I) improper design of the beer column vent condenser; (ii) late delivery of fusible link valves; and (iii) late delivery of storage tanks.[143]  The delaying event described in each of these delay claims occurred more than 21 days prior to the date of the delay claim letters.  Central sought both an extension of the substantial completion date as well as overhead costs for the number of days delayed. Agra contends that the late shipment of vessels and equipment did not prevent Central from working in other areas of the plant and that when the vessels and equipment did arrive, Central had ample time to complete work thereon before the extended completion date if it manned the project sufficiently.  Agra forwarded these claims to the owner GPRE and, in fact, utilized them to support its settlement discussions with GPRE once the project was competed.  Central did not obtain an approved change order for the valve-related delays.

As the Superior Project neared its completion in June and July of 2008, missing  instruments and valves continued to impact Central's remaining work.[144]  A number of pressure relief valves for the Superior Project were not ordered until May 13, 2008 and some of the valves had not been delivered to the site as of June 9, 2008.  Some of the materials for Central to install were at least three months late based on Central's revised March 6 substantial completion date.

## 2.    Change Orders

Along with the late delivery of vessels, equipment, and valves, the change orders proved to be another source of delay.  Agra did not strictly comply with the change order process that is carefully prescribed in the Superior Subcontract.  As all parties understood, and numerous witnesses

---

[143]  Ex. 79, 87, 88.

[144]  Ex. 95, 99, 100.

testified, absent an approved change order for the work, a subcontractor was at risk of not getting paid for any work outside its scope, if it began the change order work. Thus, it was important that change orders be promptly considered and processed or the work that is the subject of the change order could be delayed until it was approved. Agra took weeks and sometimes months to process and approve many of Central's requests for change orders.[145] Most of Central's change orders were not approved until more than four weeks after they were submitted. The owner expressed concern over Agra's slow change order process and the impact it was having on the project. By letter dated March 28, 2008, Agra President Pat Hinner responded to these concerns by acknowledging that Agra was trying to improve the change order process but noted that it could still take two weeks to process large change orders.[146]

Myers tried to work around the bureaucratic change order log jam. He testified that throughout the Superior Project Terry Chipman and Bob Shank repeatedly directed Central to begin out-of-scope work without a signed change order on the assurance that Central would be "taken care of" after the work was complete.[147] Both Bob Shank and Dave Burgess denied that they directed Central to work off-scope without a change order. An internal e-mail from Terry Chipman to Bob Shank confirms that Agra on occasion had subcontractors start work without a signed change

---

[145] Ex. 686. For example, Change Order 21 was submitted by Central on February 20, 2008 and was not approved by Agra until May 12, 2008. Change Order 22 was submitted by Central on February 25, 2008 and was not approved by Agra until May 5, 2008.

[146] Ex. 85.

[147] Dave Burgess was adamant that telling a subcontractor to work without a change order was cause for dismissal at Agra. Bob Shank testified similarly. Agra's site superintendent, Erick Soder, also testified that he did not tell Central or other subcontractors to proceed without a change order because he would have been fired for that.

46

order.[148] Sega's Brad Carver recalled specific instances of Bob Shank directing Central to perform out-of-scope work and providing assurances of payment to Central. Agra's Dave Marcott admitted that this practice was not unusual in the construction industry. Indeed, Agra approved some change orders after Central had started or completed the changed work.[149]

Agra's ex post facto approach to change orders was not applied consistently, however. With respect to change order 33 for $51,004.08, field personnel approved the change, but no Agra officer ever signed the order. Bob Shank admitted that the order was approved, but Agra did not pay Central and this unpaid change order is part of Central's claim here. Likewise, Agra refused to pay for out-of-scope work that Central performed and for which it submitted change orders. This work was valued at $149,063.18. Dave Marcott justified these non-payments at trial by stating that work done without a signed change order was a "gift" to Agra even when Central and Bobby Myers had been directed to get the work done and told that the documentation could be taken care of later.

When Central refused to go forward with non-scope work on a boiler without a change order, Agra's project manager Dave Burgess rebuked Bobby Myers in an e-mail in which he stated that he was "disappointed" by Central's "lack of cooperation" and accused Central of delaying the project. He told Myers that "he would not forget" that Central would not work without at least the assurance of a change order.[150]

### 3. Manpower Issues and Acceleration

Central also claims that Agra's directives to accelerate the work resulted in further expense.

---

[148] Ex. 53.

[149] Ex. 686.

[150] Ex. 102, 103, 104.

47

It does appear that Agra accelerated the work almost immediately after Central appeared on site, but Central mobilized to the site later than expected in May of 2007. By July of 2007, all parties recognized that the project schedule had begun to slip. Agra's construction reports for July 3 reflect that Shank directed all of the subcontractors to "ramp up" manpower and hours with a goal of completing the project's construction by December 1, 2007, to allow for several weeks of "start up" work before the extended completion time of January 11, 2008.[151] Beginning in October of 2007, Shank directed that Central add a night shift for the purpose of accelerating the piping work. Central worked a night shift through March 15, 2008, but divided up its existing work force to do so and did not add more workers.

Central did not seek or obtain a change order for the acceleration it alleges. The only authorized extension of the substantial completion date under the contract ended on March 6, 2008. Under the contract, Agra would be entitled to liquidated damages for each day beyond March 6, 2008 Central remained on site with its work not completed.

### 4.    Closing out the Superior Contract

Unfortunately, the record is murky at best concerning how Central and Agra closed out the subcontract. By letter dated April 11, 2008, Central informed Agra that it had achieved substantial completion of the piping in a number of plant areas, but not all, and requested a punch list from Agra for those areas.[152] On April 23, 2008, Agra issued a letter to all the contractors on the Superior project, requesting that all contract work be completed by May 12, 2008, including the contractor's

---

[151] Ex. 7.

[152] Ex. 90. Areas omitted from the list included DDE, water treatment system, and the tank farm.

48

review and punch list of its own work.[153]  Central and the electrical contractor would remain on site

after May 12 to assist with the start-up process.  Agra and the owner would begin their review on

April 28 and generate a master punch list.[154]   Agra did not furnish Central a punch list until early

June 2008.[155]  An updated punch list on Central's work was provided June 30, 2008, significantly

narrowing the work left from a 12 page punch list with approximately 40 items per page to a single

page with approximately 20 items.[156]

In early May, Shank met with Myers and requested Central to put together its "claim," so

that Agra could see the numbers and make a claim against the owner or Delta-T.  Shank arranged

a face-to-face meeting on May 12, 2008 between Agra and Central in Merrill, Wisconsin.  At this

time Central presented its $1.08 million impact claim to Agra.[157]  Agra took Central's impact claim

under consideration but never responded back to Central.

On Friday June 27, Myers advised Shank that Central would be reducing its work force the

following week and that it was still lacking a few valves and instruments to complete its work.[158]

It is unclear whether Central completed the punch list items but according to Burgess, Central had

a 2-man crew at Superior on July 1 to assist with the start-up.[159]  Shank testified that Central was on

---

[153]  Ex. 91.

[154]  Ex. 91.

[155]  Ex. 96.

[156]  Ex. 101.

[157]  Ex. 94.

[158]  Ex. 99 and 100.

[159]  It was during start-up of Superior that Central refused to work on the boiler without a
signed change order, drawing Burgess' ire; according to Burgess, Central was subject to the

49

site between March 6 and July 11, and after March 6 was primarily working on the water treatment system.

On July 2, 2008, Central submitted payment application 34 to Agra for the period ending June 28; Agra rejected it due to insufficient support.[160]  Central submitted payment application 35 for the period ending July 16, its final application.  Agra rejected this application because Central had demobilized from the site without completing its work and without appropriate "signoffs."[161] Both applications 34 and 35 pertained to change order work.  In the end, Agra claimed it incurred labor costs to complete Central's scope of work and repair certain substandard work.[162]  On August 14, 2008, Agra issued its certification of substantial completion on the Superior plant to GPRE.[163]

As Agra and GPRE wrangled over the final billing and settlement on the Superior project into the Fall of 2008, GPRE offered Agra approximately $6.0 million that included Agra's pending Change Order 85R on the water treatment component, discussed below.  Agra refused this offer and, on October 22, 2008, Agra, GPRE, and Delta-T met at Minneapolis, Minnesota to close out the contract.  GPRE agreed to pay Agra $7.0 million.[164]  Agra did not invite Central to be represented and, at the meeting, Agra abandoned pending Central change orders (as well as Central's  impact claims).  Agra believes that it was not paid for any of Central unapproved change order work

---

direction of others during start-up and it was part of Central's scope. *See* Ex. 102-104.

[160]  Ex. 105 and 106.

[161]  Ex. 107 and 108.

[162]  Ex. 109, 110, 592.

[163]  Ex. 111.

[164]  Ex. 147.

50

because the $7.0 million it received on October 22, 2008 was less than the $7.45 million remaining balance on the contract at September 25, 2008, and represented a reduction by Agra of its "total claim dollars" – including change orders and outstanding claims – of over $10.0 million.

### B. Water Treatment Plant

Agra's scope of work at the Superior facility did not include construction of a water treatment system. After the project began, however, owner GPRE concluded that the water quality at the site would not suit the production of ethanol and that a separate water treatment facility should be constructed. To that end, GPRE employed Agra to lay concrete and build a water treatment building. It also separately employed Sega to design the water treatment facility. Agra issued a change order to the owner in the fall of 2007 for the concrete and construction work which was to be completed by November 15, 2007. That work was not completed on time. In the meantime, Agra secured Central to bid and install certain underground piping to the facility. The owner's project representative Scott Flynn directed Central to proceed and, on January 8, 2008, Central submitted Change Order 14 to Agra.[165] Agra submitted its own Change Order 51 to GPRE.[166] Neither change order contained pricing because the design was not yet complete.[167] As a result, GPRE declined to approve Agra's open-ended change order. Central's Change Order 14 was voided and Agra directed Central to prepare and submit Change Order 16 for underground piping, equipment, and labor.[168]

Central submitted its Change Order 16 on January 14, 2008, expanding the scope of

_____

[165] Ex. 119. Change Order 14 was dated January 8, 2007 [sic] and signed by Central on January 8, 2008. The Court believes the 2008 date to be the correct one.

[166] Ex. 127.

[167] Ex. 120.

[168] Ex. 121

51

Central's work, increasing the price by some $37,000 and increasing the contract time by ten working days.[169]   Agra submitted its Change Order 56 for the same work and it was approved by GPRE prior to Agra's approval of Change Order 16; on January 17, 2008, Agra provided Change Order 56 for Central's reference, and apparently to assure Central that Agra would be approving Change Order 16 and that Central could safely begin work on the water treatment piping.[170] Nevertheless, on January 17, 2008, Chipman sent Myers a copy of approved change order 56, instructed him not to "let this get in the hands of Heather [Clutter] or Coreen [Hebert-Immel]."[171] The court characterizes this comment not as an attempt at deception, but as a further assurance that change orders would be approved so that work might go forward.   Chipman requested Central to proceed with the work even before Change Order 16 was approved and Central did so.   Agra approved Change Order 16 on January 28, 2008.

Chipman then asked Central to bid the above-ground piping to the facility and, in response, Central submitted Change Order 18 on January 24, 2008.[172]   This change order requested an additional $282,813 and 29 additional days to complete.   Agra approved this change order on February 20, 2008.  Agra believes that it has paid for the work described on Change Orders 16 and 18.

In March, as Central's water treatment work progressed, Central concluded that the cost of the work would exceed the bounds of the approved change orders.  It therefore submitted Change

---

[169]  Ex. 124.

[170]  Ex. 122.

[171]  Ex.  122.  Ms. Hebert-Immel worked in Agra's business office.

[172]  Ex. 126.

52

Order 18A on April 2, modifying change order 18 to remove the dollar limitation and allow for the work to be concluded on a "time and materials" basis.[173]  Terry Chipman signed this change order on May 1, 2008, but no one else in the Agra hierarchy did.  The Superior Subcontract required all change orders to be approved by the project manager (Chipman) and an Agra officer.[174]  Chipman sat on the Change Order for a month before signing and, during that time period, Myers advised him of additional cost increases resulting from various pending design changes.  Chipman asked Myers to submit yet another change order and, on April 24, Central submitted Change Order 49 for $119,805.[175]  On May 29, Myers submitted a revision to that change order, Change Order 49R for $283.650 that was based on the most recent plan revisions.[176]  Agra submitted its own Change Order 85R to GPRE, also on May 29.[177]

GPRE, in turn, sat on Change Order 85R until July 22, at which time its CEO e-mailed Shank that these change orders were submitted after "a majority, if not all" of the described work had been completed and without any back-up itemizations.  He asked, "How can this occur in a professional environment like this?"[178]  Shank responded that Scott Flynn, GPRE's site representative, told contractors "to just keep going and that they would be taken care of by Scott Flynn. . . . Both CSMI [Central] and Van Ert [the electrical contractor] were told to keep working and they would be taken

---

[173]  Ex. 128.

[174]  Ex. 3, § 5.2.

[175]  Ex. 130.

[176]  Ex. 134.

[177]  Ex. 136.

[178]  *Id.*

care of by Scott Flynn."[179]  Mr. Flynn testified that any "feedback" he gave would be "based on direction from Dan Christensen in particular and the Green Plains folks."  Flynn denied stating that "he" would take care of the contractors.  In any event, neither of these change orders was approved.  There is a significant conflict in the evidence regarding who made what oral commitment concerning payment for the water treatment facility work.  The evidence of oral representations about payment without change orders is consistent with the frenzied efforts of the parties to complete the Superior plant, but it is not necessarily evidence of an enforceable oral modification of the contract.  Central was well-aware of the possible adverse consequences of undertaking non-scope work without a change order, as was Agra.  Central was never paid for any water treatment work exceeding the amounts set out in change orders 16 and 18.

### C.  Findings Concerning Damages at Superior

Whether Central's impact claim has merit is in large part related to whether Central remained on site after March 6, 2008 because of events outside its control.  Central says that the acceleration and delay damages it suffered were due to problems with the schedules issued by Agra, incomplete process design, and the late delivery of valves, vessels and equipment.  Central's scheduling expert, Mr. Schwartzkopf, concluded that incomplete scheduling delayed Central by 243 days, and that Agra failed to pay for 134 of those days.  Mr. Schwartzkopf also stated that in the absence of signed change orders, Central could not expect to be compensated for these delays.  He further pointed out that Central would likely have remained on site after the substantial completion date to assist in start-up and punch-list work.

Agra's scheduling expert, Mr. Molczyk, utilized a hypothetical scheduling model to conclude

---

[179]  Ex. 137.

that Central's delay was caused by its having underbid and understaffed the project. The Court discounts Molczyk's testimony for several reasons. Agra was sufficiently satisfied with Central's work and staffing practices to sign a subsequent contract with Central on the Plymouth project on October 17, 2007, three months after the July acceleration notice at Superior. Moreover, Molczyk's conclusions rest on a highly theoretical foundation while Schwartzkopf's are, in fact, based upon the reality of what occurred at Superior.

As adjusted by approved change orders, the GMP of Central's work was $12,870,254. Agra paid Central $11,027,616 and directly paid Central's subcontractors $1,540,724 for a total of $12,568,340.[180] Subject to back charges and other deductions, Agra remains obligated to Central in the amount of $301,914. The parties disagree on this remaining amount, though, because Central asserts that Agra overpaid Central's subcontractor, Diamond Insulation about $26,000 making the unpaid balance due Central $333,106.[181] Agra argues that what it paid Diamond Insulation was the amount of Diamond's mechanic's lien filed against the project.[182] The Court concludes that Agra did not overpay Diamond by paying the amount of its mechanic's lien, the amount necessary in order to discharge the lien against the property. Central was obligated to pay its subcontractors and any billing or payment dispute with Diamond should have been resolved between them. The Court further concludes that the best evidence of the amount owed to Diamond and paid by Agra for

---

[180] Ex. 264.

[181] Ex. 264.

[182] Central disputed the amount it owed its subcontractor Diamond and therefore claimed that the amount of the mechanic's lien filed by Diamond against the property was overstated by $31,192. But Central refused to discharge the lien. *See* Ex. 274.

55

Central's benefit, is the mechanic's lien statement filed under oath by Diamond.[183] Accordingly, the Court finds that if Central is entitled to recover under the Subcontract, the proper unpaid adjusted GMP for Central's cost of the work is $301,914.

Central also asserts a $1,136,608 impact claim, as revised, for additional costs resulting from delays and late deliveries not caused by Central.[184] The impact claim has three components: additional time on site (extended overhead) past the substantial completion date, costs to install late delivered valves and out of sequence work, and accelerated labor costs due to late delivery of equipment.[185] The impact claim is not supported by a signed change order.

In addition to these components of damages, Central asserts a claim for additional labor in connection with the water treatment system based on Change Order 18A, signed in the field by Terry Chipman, but not by an Agra officer as required by the subcontract.[186] That change order would have changed the method of payment for the water treatment work from Central's set price to "time and materials." That would have resulted in an increased price of $242,535.[187]

Finally, Central asserts a claim for $149,063 related to 9 disputed change orders. Central performed the work but none of the change orders was approved.[188] Because Agra did not approve

---

[183] Ex. 505, p. 28-29.

[184] Ex. 264. Central originally asserted an impact claim of $1.08 million per Exhibit 94

[185] Ex. 94, 264.

[186] The contract provides at § 5.2 that change orders must be signed by Agra's project manager and at least one officer. Only Chipman, who was not an officer, signed this change order.

[187] Ex. 264, 140, 269.

[188] Ex. 264, 273.

56

or execute these change orders, Central's claim is based on quantum meruit, a theory which, like Agra's alleged breach of good faith and fair dealing, will be discussed below.

Agra asserts that it is entitled to back charge Central $269,525 for Agra's costs to complete Central's scope of work or fix substandard work.[189]  Yet, it is not apparent that Agra followed the punch-list as set out in the subcontract and, accordingly, the Court finds that Agra has not met its burden of proof on this point.  In addition, Agra did not give prior written notice before undertaking the corrective work.[190]  Agra's claimed back charge is disallowed.

### D.  Superior Analysis and Conclusions of Law

Both the Superior and Plymouth Subcontracts provide that they shall be governed by the law of the place where the project(s) is located.[191]  Iowa law, therefore, governs the parties' contract claims.  Both Central's and Agra's claims in this case are predicated upon a breach of the Superior and Plymouth Subcontracts.  Their claims are based upon each other's alleged deficient performance under the terms of the Subcontracts.

In order to establish a breach of contract claim under Iowa law, a plaintiff must prove the following:  (1) the existence of a contract and its terms and conditions; (2) that plaintiff performed all terms and conditions required of it under the contract; (3) the defendant's breach of the terms and conditions of the contract; and (4) that plaintiff suffered damages as a result of the breach.[192]  A party's nonperformance of a duty under the contract is a breach unless the party's performance is

---

[189]  Ex. 592.

[190]  Ex. 3, § 3.3.2.

[191]  Ex. 4, § A13.1.1; Ex. 159, § 13.1.1.

[192]  *Iowa-Illinois Gas & Elec. Co. v. Black & Veatch,* 497 N.W.2d 821, 825 (Iowa 1993).

57

excused or performance is not due.[193]  Restatement (Second) of Contracts § 235, Comment *b* speaks

to the effect of a party's nonperformance:

> Non-performance is not a breach unless performance is due.  Performance may not
> be due because a required period of time has not passed, or because a condition has
> not occurred (§ 225) . . . In such a case non-performance is justified.  When
> performance is due, however, anything short of full performance is a breach, even
> if the party who does not fully perform was not at fault and even if the defect in his
> performance was not substantial.  Non-performance of a duty when performance is
> due is a breach whether the duty is imposed by a promise stated in the agreement or
> by a term supplied by the court (§ 204), as in the case of the duty of good faith and
> fair dealing (§ 205).  Non-performance includes defective performance as well as an
> absence of performance.[194]

If a party's nonperformance is material, it discharges the injured party's performance of its

remaining contractual duties.[195]  As the Iowa Supreme Court noted in *West v. Jayne*:[196]

> The fact that a certain performance is required on the part of one of the contracting
> parties does not necessarily render it a condition precedent to the enforcement of any
> performance on the part of the other party to the agreement. *Union Story Trust &
> Sav. Bank v. Sayer,* 332 N.W. 2d 316, 322 (Iowa 1983).  In the *Sayer* case, we said:
> > [I]n order to predicate the discharge of one of the contracting parties upon breach
> > of condition by the other, the party claiming discharge must show the condition

---

[193]  *Metropolitan Transfer Station, Inc. v. Design Structures, Inc.,* 328 N.W. 2d 532, 537-
38 (Iowa App. 1982)(citing Restatement (Second) of Contracts § 235 (1979) and identifying
excuses for nonperformance: impossibility, an act of God, and interference by a third party).

[194]  Illustration 4 of the Restatement (Second) of Contracts § 235 shows this legal
principle: "A contracts with B to repair B's building for $20,000, payment to be made "on the
satisfaction of C, B's architect, and the issuance of his certificate."  A makes the repairs but does
not ask C for his certificate.  B does not pay A.  B's non-performance is not a breach.  It is
justified on the ground that performance is not due because of the non-occurrence of a
condition."

[195]  *See* Restatement (Second) of Contracts § 237; *Van Oort Construction Co., Inc. v.
Nuckoll's Concrete Service, Inc.,* 599 N.W. 2d 684, 692 (Iowa 1999) (discussing a material
breach of noncompete agreement that justified other party in suspending its own performance
under the contract.).

[196]  484 N.W. 2d 186, 189 (Iowa 1992), *quoting Pirkl v. Northwestern Mut. Ins. Ass'n,*
348 N.W. 2d 633, 636-37 (Iowa 1984).

58

breached constituted the entire agreed exchange by the other party, or was expressly recognized in the bargain as a condition for the other's performance. *Id.*

The *West* court went on to conclude that plaintiff's failure to pay defendant his weekly salary neither permitted the defendant to annul the contract nor deprived the plaintiff of his contractual rights.

At most, West's failure to pay is a partial breach which does not deprive West of his contractual rights. . . . In this case, the record reveals that Jayne's weekly salary comprised a minor portion of Jayne's compensation. Jayne's weekly salary was not a condition that constituted the entire agreed upon exchange by the parties, nor did it go to the whole of the contract.[197]

Thus, only a material breach will excuse the other contracting party's performance. The Restatement (Second) of Contracts § 241 identifies the factors for determining the materiality of a breach, a material breach which may justify the other party in using "self-help-suspension of performance" in order to obtain the bargained-for performance of the other party."[198]

In determining whether a failure to render . . . performance is material, the following circumstances are significant:
(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
(c) the extent to which the party failing to perform . . . will suffer forfeiture;
(d) the likelihood that the party failing to perform . . . will cure his failure, taking account of all the circumstances including any reasonable assurances;
(e) the extent to which the behavior of the party failing to perform . . . comports with standards of good faith and fair dealing.[199]

This is to be distinguished from a material breach by defendant that *discharges* plaintiff from

---

[197] *Id.*

[198] *See Van Oort Const. Co., Inc., supra* at 692, n.3 (distinguishing a material breach that entitles the other party to use self-help-suspension of performance versus a material breach that discharges the other party's remaining duties).

[199] Restatement (Second) of Contracts § 241

59

performing its remaining duties.  In the latter situation, the courts consider these additional factors

to those stated in § 241:

> In determining the time after which a party's uncured material failure to render or to
> offer performance discharges the other party's remaining duties to render
> performance under the rules stated in §§ 237 and 238, the following circumstances
> are significant: . . .
> (b) the extent to which it reasonably appears to the injured party that delay may
> prevent or hinder him in making reasonable substitute arrangements;
> (c) the extent to which the agreement provides for performance without delay, but
> a material failure to perform or to offer to perform on a stated day does not of itself
> discharge the other party's remaining duties unless the circumstances, including the
> language of the agreement, indicate that performance or an offer to perform by that
> day is important.

Even if a party commits a partial breach (as opposed to a material breach), the breaching

party may still be answerable in damages for his partial breach.[200]  A breach by nonperformance

gives rise to a claim for damages for total breach if the breach discharges the injured party's

remaining duties to render performance (*i.e.* a material breach).[201]  When a contract is breached, the

nonbreaching party is generally entitled to be placed in as good a position as it would have occupied

had the contract been performed.[202] These damages are sometimes referred to as expectation interest

or benefit of the bargain damages.[203]  In any event, the damages sought for breach of contract must

have been foreseeable or within the contemplation of the parties when the contract was made.[204]

---

[200]  *See* Restatement (Second) of Contracts, § 236 and § 241, Cmt. a;

[201]  *See* Restatement (Second) of Contracts, § 243.

[202]  *G&K Services, Inc. v. Seneca Waste Solutions, L.L.C.,* 2010 WL 624901 at *4, 781
N.W. 2d 101 (Table) (Iowa App. 2010)

[203]  *Id.*

[204]  *Id.*

60

With these principles of contract law in mind, the Court now turns to the parties' performance and nonperformance of the terms of the Superior Subcontract and claimed damages for alleged breaches.

### 1. Remaining Unpaid GMP for Cost of the Work

Before reaching the issue of whether Central's performance duties under the Superior subcontract were excused by Agra's alleged breaches, the Court concludes that Central is entitled to recover the unpaid remaining cost of the work it did at Superior, or $301,914. In April of 2008, Central certified that it was substantially complete in some areas and requested a punch list. That punch list was provided by Agra in early June and in late June Central informed Agra that it would be reducing its work force the first week in July. It is disputed whether Central completed the punch list items, but apparently Central had completed piping in all areas of the plant, whether or not Agra incurred cost in "remedying" Central's alleged substandard work.[205] The record shows that Central's last payment application (# 35) submitted on July 16 (for an approved change order) was rejected but the plant was running at 92% nameplate capacity by the end of July.[206] It does not appear from the record that Central submitted a final application for payment. And Agra issued its certificate of substantial completion to the owner GPRE on August 14, 2008.

Once Central completed its work, Agra was obligated to request payment for the value of that work from the owner. Within 30 days of the owner's certificate for payment, Agra was obligated to pay Central under § 16.9 of the Subcontract. Section 16.9.1 provides that when the

---

[205] The Court notes that in closing arguments, counsel for Agra conceded that Central substantially completed its scope of work. Tr. 11/12/10, pp. 87-88.

[206] *See* Ex. 107, 108, 109, 110.

61

subcontractor's work is substantially complete, upon application by the subcontractor, the contractor shall make prompt application to the owner for the work. Once the owner issues a certificate for payment concerning the work, the contractor shall pay the subcontractor within 30 days, less any funds withheld to cover costs of items to be completed. Final payment to the subcontractor constituting the entire unpaid balance of the Subcontract Sum, shall be made when the subcontractor's work is fully performed, the owner has issued a certificate for payment covering the subcontractor's work, and the contractor has received payment from the owner.[207] Section A.9.8 of the General Conditions further defines the contractor's duties and states that when the subcontractor completes its work, it is to prepare a "comprehensive list of items to be competed or corrected prior to final payment."[208] Then the subcontractor is to complete those items. When the contractor receives the list, it is to inspect to determine whether the work has been completed and, if parts of the work remain undone, the subcontractor is to complete them and request another inspection.[209] When the work is complete, the subcontractor is to prepare an acknowledgment of substantial completion and if the contractor agrees the work has been done, the acknowledgment should be signed. Once the work is completed and ready for inspection and acceptance, the contractor is to promptly inspect and make final payment to the subcontractor, subject to the owner's certifying the work has been done.

Central substantially completed its work on July 16, 2008. Neither Agra nor Central observed all of the formalities of the punch-list process outlined above. Under § 16.9.1 Agra was

---

[207] Ex. 3, § 17.1.

[208] Ex. 4, § A.9.8.2.

[209] *Id.* at § A.9.8.3.

then obligated to apply to the owner for Centra's payment. After Agra rejected Central's Payment Application 35, it certified substantial completion to the owner in mid-August and "resolved" Central's payment claim by unilaterally negotiating with the owner and accepting $7.0 million for its outstanding claim. The Court construes the owner's acceptance and payment at the Minneapolis meeting on October 22, 2008 as Agra's certification that Central's work had been done. Because no one complied with the punch-list process and because Central was denied any meaningful opportunity to remedy any alleged defaults, it was and is entitled to receive the contract balance remaining due and owing in the amount of $301,914, together with interest at the rate of 6% from and after August 14, 2008, the date that Agra certified Central's substantial completion under the Subcontract.[210] Finally, the Court deems Agra's failure to pay Central the remaining $300,000 balance on the GMP a partial breach, where Central's adjusted GMP was $12.870 million.[211]

In addition to the unpaid balance of the Subcontract GMP, Central asserts a claim for interest on the late progress payments made by Agra. Agra does not dispute Central's right to interest or the interest calculations on late progress payments. Accordingly, Central is also entitled to the sum of $5,108.48, representing 6% interest on the late progress payments.[212]

### 2. Superior Delay and Impact Claims

a. Did Central comply with the delay claim and change order process set out in the contract?

The Terms and Conditions did not permit the parties' contract to be modified without a

---

[210]  Ex. 3, § 20.2.

[211]  *See West v. Jayne,* 484 N.W. 2d 186, 189 (Iowa 1992) (finding nonpayment a partial breach where the unpaid amount did not constitute the entire agreed upon exchange by the parties and did not go to the whole of the contract).

[212]  Ex. 271.

63

written agreement signed by the party against whom the modification is claimed or asserted.[213]  A change order signed by Agra was the appropriate mechanism to effect a modification of the Subcontract, whether it be a change in the amount of the Subcontract, the length of time to complete the work, or a claim for damages for delay.[214]  Even a party's waiver of a Subcontract condition or provision or a party's rights thereunder was required to be in writing and signed by the party purporting to waive the term, condition or provision.[215]  Nor was a contractor's "action or failure to act" an approval of or acquiescence in a breach of the terms and conditions, "except as may be specifically agreed in writing."[216]

The Subcontract provided that the cost of the work would not include any cost not included in change orders approved by Agra that would cause the GMP to be exceeded.[217]  Change orders were to be executed for any change to the completion date or payment amount and were to be executed by the project manager and one of the Agra's officers.[218]

If Agra caused a delay in the subcontractor's performance, the subcontractor was to give Agra a delay notice in writing within 3 days of the earlier of "the commencement of such delay, or . . . the Subcontractor reasonably discover[ing] the delay."[219]  The subcontractor waived the right

---

[213]  Ex. 4, § 13.6.1

[214]  Ex. 3, §§ 1.3, 5.3.

[215]  Ex. 4, § 13.6.1 and § A.13.4.2.

[216]  Ex. 4, § A.13.4.2.

[217]  Ex. 3, § 12.1.8.

[218]  Ex. 3, § 5.2.

[219]  Ex. 3, § 9.3.

64

to an extension of the substantial completion date if it did not give timely delay notice.[220] Extensions

of the completion date required the contractor's approval of a change order.[221] This 3 day delay

notice provision in the Subcontract conflicts with the 21-day notice provisions contained in the

Terms and Conditions. Section 1.2 of the Subcontract provides that except to the extent of a specific

conflict between the subcontract and the Terms and Conditions, the latter control. Thus, the Court

concludes that the 3-day provision controlled here. In any event, as Central did not give notice of

its various delay claims within even the 21-day limit, the difference is of little consequence in this

case.[222]

Even if the delay claim procedure incorporated in the Terms and Conditions apply here, its

mechanics are murky at best. The Subcontract requires that Central's delay claims be made in

sufficient time to allow Agra to make a claim to the owner, two days prior to the time by which

Agra's claim was to be made under § 5.3 of the Subcontract.[223] Yet, § A.4.1.2, a part of the "Dispute

Resolution" section of the Terms and Conditions, provides that claims made by either party must

be made 21 days after the triggering event occurs. This contrasts with the more-specific process for

claims for additional time which establishes the "excusable events of delay" ("EED") and provides

that notice of those must be given within 7 days of their occurrence and a "delay claim" filed 14

---

[220] *Id.*

[221] *Id.* at § 9.5 and § 5.3.

[222] Ex. 4, § A.4.1.2. This is one of several inconsistencies in the contract documents used at Superior, starting with the fact that the Subcontract form A401 references the usage of General Conditions form A201. Instead, the parties executed Terms and Conditions on form 141, suggesting to the Court that the A141 may contain provisions that do not tandem with the A401 Subcontract. Neither side explained this discrepancy.

[223] Ex. 3.

days after the occurrence. The Court concludes that the delay claim section of the agreement is more specific and construes that claims for matters other than EED are to be filed within 21 days under the general terms of § A.4.1.2 because "claim" is broadly defined to include not only delay claims for EEDs but any demand for payment of money, extension of time, or other relief.

Section A.4.1.7 of the Terms and Conditions addresses "Claims for Additional Time" to perform the work.[224] It provides that the subcontractor first provide a written notice of an EED ( a "Delay Notice") that sufficiently informs the contractor of the EED's occurrence.[225] Then the subcontractor must submit a writing that details the explanation for the delay and set out a plan for restoring the schedule and mitigating any damages, as well as any Modification requested to the construction schedule (a "Delay Claim").[226] Section A.4.1.7.1 further provides that no changes shall be made to the schedule without a change order.

Therefore, upon the occurrence of an EED, Central had 7 days to submit its Delay Notice and 14 days to submit its Delay Claim. Both periods ran from the date of the EED. After submitting a Delay Claim, Central was required to continue to work, making all reasonable efforts to minimize the effect of the delay and "continue progress in areas of the work not affected by the [EED]."[227] Delays in the "receipt of necessary materials or equipment" for up to 75 days constitute EEDs under the contract.[228] Any other delays not caused by the subcontractor or the subcontractor's vendors

---

[224] Ex. 4.

[225] *Id.* at § A.4.1.7.2

[226] *Id.* at § A.4.1.7.3.

[227] *Id.*

[228] *Id.* at § A.8.3.1.7.

66

(*e.g.* design changes) are also EEDs.[229]  If the subcontractor complies with these Delay Notice and Delay Claim provisions and the delaying event is an EED, the construction schedule is to be modified *by change order* by the number of days which the EED causes the schedule to be extended.[230]

Central had seven days after it determined that receipt of materials had been delayed to submit a Delay Notice.  The record suggests that Central first experienced the effects of delayed deliveries of valves and vessels as well as continually revised drawings as early as June of 2007. Not until November 7, 2007 did Central file its first Delay Claim that followed its November 6 transmittal of a 36-page list of missing valves.  The Court will assume that the missing vale list was intended as a Delay Notice.  The Delay Claim was filed only after Bob Shank and Terry Chipman encouraged Central to document its position and after Chipman supplied Bobby Meyers with a copy of a delay claim Agra had filed with GPRE to use as a form.  It is impossible to "match up" Central's claimed days of delay with the series of claims that Central filed beginning in November of 2007. The only clear evidence on this is Mr. Schwartzkopf's factually unsupported conclusion that up to 75 of the 134 delay days were attributable to this EED.  Central had the burden of proving the dates of the trigger events and that it timely noticed those events to Agra.  Because it failed in that proof, the Court concludes that the November, 2007 Delay Claims were untimely noticed and filed and must be denied.

Central also pursued delay claims in March and April of 2008.  On March 14, 2008, Bobby

---

[229]  *Id.* at § A.8.3.2.1.

[230]  *Id.* at § A.4.1.7.4.  However, the change order will not extend the substantial completion date if the impacted tasks are not on the Critical Path.

67

Myers wrote to Pat Hinner that it had been delayed in the installation of a beer column vent condenser on January 23, 2008.[231]  The delay arose when the flange holes were found to be out of alignment with the piping due to an error by Delta-T, clearly an EED.  When an adapter kit was shipped to the site by Delta-T, it was warped.  The adapter kit arrived on March 13 and Central discovered its flaws on March 14.  Central claimed additional time for completion after January 23 as well as additional cost of $6,328.  Under the §§ A.4.1.7.2 and A.4.1.7.3 of the Terms and Conditions, Central had 7 days from January 23 to file its Delay Notice and 14 days to file its Delay Claim.  Instead, Central waited until March 14.  This claim was untimely.[232]

Two claims filed by Central in April of 2008 are similarly deficient.  In a letter dated April 1, 2008, Central asserted that fusible links were delivered late and requested additional time to complete the contract beginning November 6, 2007 plus an additional $6,382 in cost.[233]  The letter makes no mention when the fusible links were to be delivered or when they actually were delivered.  As Central requests additional time after November 6, 2007, the Court concludes that this was the date Central first recognized a fusible link issue.  The April 1, 2008 letter was written well past the 7-day Delay Notice deadline.  A second so-called "Delay Claim" is dated April 1, 2008 and seeks additional time after December 31, 2007 as well as additional cost for delays resulting from the late delivery of tanks to the ethanol storage area.[234]  Again, no late delivery date is noted in the letter, but if Central recognized the delay on December 31, 2007, its 7-day time to file a Delay Notice had long

---

[231]  Ex. 79.

[232]  It appears that the notice would have been timely as to the March 14 discovery that the adaptor was warped, but the body of the claim does not seek relief for that obvious EED.

[233]  Ex. 87.

[234]  Ex. 88.

68

since passed on April 1, 2008.

                     b.      Non-EED Claims:  Additional Costs of Acceleration and Extended Duration

Section A.4.1.5 of the Terms and Conditions addresses *claims for additional costs*.[235] Section A.4.1.5.2 states that claims under § A.4.1.5 involve additional costs *not* associated with an EED.  Therefore, this section governs claims for additional costs due to a change in the scope of work.  As an example, in this case, § A.4.1.5 would govern Central's claim for increased costs for the water treatment system.  If an additional cost claim arises out of an EED, the same Delay Notice and Delay Claim process that governs claims for additional time due to an EED as set forth above also controls claims for EED-related additional costs.[236]  Central's impact claim for additional labor costs associated with delays in valve and equipment delivery or design changes would be subject to the Additional Time provisions in § A.4.1.7, while Central's impact claim for additional labor costs associated with Agra's acceleration directive would be subject to the Additional Cost provisions in § A.4.1.5.

For non-EED claims for additional costs, the subcontractor is required to follow a similar notice and claim process as for claims for additional time, although the time requirements differ. The subcontractor must give written notice of an event that the subcontractor believes involves additional costs within 21 days after the occurrence of an event (Additional Cost Notice) and submit

---

[235]  Ex. 4.

[236]  The Court notes that in § A.4.1.5.2 it states that claims for additional costs associated with an EED "are to be addressed as set forth in Subparagraph A.4.3.6."  This referenced subparagraph, however, does not exist in the Terms and Conditions.  The Court therefore concludes that additional cost claims associated with an EED should follow the same Delay Notice and Delay Claim process as set forth for claims for additional time in § A.4.1.7 and as described above.

a claim within 30 days of the event involving additional costs, providing a detailed explanation for the additional costs and request any modification to the GMP (Additional Cost Claim).[237] The Additional Cost Notice is to be given "before proceeding to execute the Work."[238] These provisions require, in addition to the Notice and Claim, an executed change order to effect a change in the GMP.[239] Further, the Terms and Conditions unequivocally state that any work done by the subcontractor without a change order that exceeds its scope of work in the subcontract is done at the expense of the subcontractor.[240]

The Court believes these Additional Cost provisions govern the following two elements of Central's $1.136 million impact claim: (a) Central's additional costs for increased labor due to Agra's acceleration directive and (b) Central's additional costs for overhead due to the extended duration it was on-site after the substantial completion date. Central's $242,000 claim for additional costs associated with the water treatment system is also subject to the Additional Cost provision in § A.4.1.5.

c.     Acceleration Labor Costs

Central claims nearly $460,000 in additional labor costs that it attributes to Agra's acceleration of Central's work.[241] Agra issued the acceleration directive in July of 2007 when Bob Shank unilaterally directed all of the Superior subcontractors to "ramp up" their work to remedy

---

[237] Ex. 4, §§ A.4.1.5.2 and A.4.1.5.3.

[238] *Id.* at § A.4.1.5.

[239] *Id.* at §§ A.4.1.5.4, A.4.1.5.1, and A.4.1.5.

[240] *Id.* at § A.4.1.5.1.

[241] Exs. 94, 264.

70

delays caused by later drawings and out of sequence deliveries. Central did not file an Additional Cost Notice or Claim in accordance with §§ A.4.1.5.2 and A.4.1.5.3.[242] These additional labor costs were not presented to Agra until May 2008. No change order was ever submitted and approved for this additional cost.[243] Even had such a claim been filed, Central did not demonstrate how many of the claimed delay days described by Schwartzkopf should be attributed to acceleration costs.

        d.      Extended Duration Overhead Costs

Central claims some $618,949 of additional overhead costs associated with Central's extended duration on site to complete its scope of work.[244] The extension of the substantial completion date to March 6, 2008 was the latest-occurring event that triggered these additional duration costs. Central knew on that date that it had not completed its scope of work and would be required to stay longer. Central did not file a timely Additional Cost Notice or Claim in accordance with §§ A.4.1.5.2 and A.4.1.5.3.[245] Nor did it submit a change order to Agra for these additional costs. The extended duration/overhead costs were not submitted in writing to Agra until May 12, 2008 when Central presented its impact claim at the parties' meeting in Wisconsin. The Court notes that Central claims delay days back to January 11, 2008, prior to the extended substantial completion date of March 6, 2008, rendering its duration claim even more untimely.[246]

        e.      Water Treatment Piping Costs

---

[242] Nor did Central submit a Delay Notice and Delay Claim under § A.4.1.7.

[243] Ex. 94.

[244] Exs. 94, 264.

[245] Nor did Central submit a Delay Notice and Delay Claim under § A.4.1.7.

[246] Ex. 94.

Central claims additional costs of $242,535 for completion of the piping for the water treatment system. Central submitted Change Order 18A to request a change of the work on the water treatment system to a time and materials basis on April 2, 2008. Certainly Central knew then that its cost of work on the water treatment system would exceed approved Change Orders 16 and 18.[247] By email dated April 22, 2008, Myers confirmed that Central's costs were "over budgetary T/M Price."[248] Yet Central made no timely Additional Costs Notice or Claim per §§ A.4.1.5.2 and A.4.1.5.3. Instead, it continued with piping work on the water treatment system without an approved change order by Agra and never obtained a change order for this additional cost.

f.      Out-of-Sequence Costs

The remaining component of Central's impact claim involves about $58,000 in additional costs associated with out-of-sequence work due to late delivery of valves. This claim was asserted May 12, 2008, after Central performed the valve work. Because Central had no control over the delivery of valves, the Court considers this claim to be an Additional Costs claim associated with an EED that is governed by § A.4.1.7. Central did not give a timely Delay Notice or Delay Claim as required by §§ A.4.1.7.2 and A.4.1.7.3. Nor did it obtain a change order for this additional cost before performing the claimed out-of-sequence work.

Central failed to comply with the notice and claim process set forth in §§ A.4.1.7 and A.4.1.5 in pursuing any of its impact claims. Central performed work for which it now claims additional costs without giving notice or filing a claim. Except for the water treatment facility work, Central submitted no change orders for the additional costs that make up the impact claim and Central

---

[247] *See* Exs. 128, 124, 126.

[248] Ex. 129.

performed that work prior to and without an executed change order. As to the water treatment facility, Central received a lump sum change order, but not an approved change order to do the water treatment work on a "time and materials" basis. In the absence of an executed change order as Article 5 of the subcontract and Article 4 of the Terms and Conditions required, the GMP was never modified.[249] That does not, however, close the discussion.

g. Did Agra breach the change order provisions and, if it did, does that breach excuse Central's compliance with them?

Central argues that Agra's breaches of the contract by failing to communicate or cooperate with the subcontractor and by failing to consistently apply the change order provisions excuse Central's compliance with the claims and change order process. This contention apparently goes toward Central's $149,063 claim on nine disputed change orders[250] and the water treatment change order, which will be addressed separately below.[251]

Under the Subcontract, Agra is obligated to "expedite written responses to submittals made by [Central] in accordance with . . . Article 5 [change orders]."[252] Section A.7.2.1 of the Terms and Conditions further delineates Agra's time parameters to respond, giving it 5 days to accept or reject the change order.[253] If the change order is not affirmatively accepted or rejected within the 5 day period, the subcontractor is to continue with the original scope of work. In other words, if the

---

[249] Ex. 3, § 12.1.8.

[250] Exs. 264, 273.

[251] There were no claims or change orders submitted with respect to Central's impact claim and therefore the Court cannot assess Agra's compliance with its contractual duties as to these additional cost claims.

[252] Ex. 3, § 3.1.1.

[253] Ex. 4.

subcontractor does not obtain the contractor's approval, its recourse is to not perform the work. As numerous witnesses testified at trial, a subcontractor who proceeds with the change order work without an approved change order, does so at its peril.[254] Section A.7.1.2 of the Terms and Conditions provides that a change order is to be based "upon agreement" between Agra and Central.[255] When the parties cannot agree on a change order, Article 6 of the Subcontract recognizes the right to mediate and arbitrate such disputes.[256]

The evidence regarding these nine "disputed" change orders is scant, at best. Agra never approved these change orders and the Court notes that a rejection of a change order, in and of itself, does not mean that Agra breached the change order provisions. Central bore the responsibility to substantiate its claim for additional costs.[257] Seven of the nine change orders are dated after the extended substantial completion date of March 6, 2008. Since Central makes a claim for the additional costs sought under these change orders, the Court assumes that Central proceeded with the work described in them without receiving an affirmative acceptance of these change orders.

From its examination of the change order log and these nine change orders, the Court gleans the following.[258] Change Order 5 was dated November 6, 2007 and "cancelled," per TC [Terry Chipman] on December 7. It appears from the back-up daily time sheets and construction report that

---

[254] No less than 6 witnesses recognized this construction industry standard: Bob Shank, Dave Burgess, Craig Pumper (Wanzek), Jason Baertsch (Van Ert, electrical subcontractor on Superior and Plymouth projects), Heather Clutter (Central's former bookkeeper), and William Schwartzkopf (Central's expert).

[255] Ex. 4.

[256] Ex. 3.

[257] Ex. 4, §§ A.4.1.1, A.4.1.5.

[258] Ex. 686.

Central performed this "off scope work" in February and March of 2008. Change Order 15 was dated January 9, 2008 and was rejected on February 19, 2008. This work was performed in September of 2007, prior to submitting the change order. Change Order 24 was dated March 17, 2008 and is shown "pending" in the amount of $2,083.44. This work was performed prior to submitting the change order. Change Order 26 was dated March 19, 2008 and denied on April 3, 2008 by "BS" [Bob Shank]. The change order work was done before the change order was submitted. Change Order 29 was dated March 21, 2008 and is shown cancelled with no date specified. The change order work was performed after the change order was submitted. Change Order 30 was dated March 25, 2008 and cancelled on April 9, 2008 per "TJC" [Terry Chipman]. The cancellation was at the direction of Delta-T which ordered the correct size control valve to address the problem. Change Order 37 was dated April 10, 2008 and cancelled on an unknown date. The work was performed prior to submitting the change order. Change Order 38 was dated April 9, 2008 and cancelled on an unknown date, apparently because the work was within Central's scope of work. Finally, Change Order 46 was dated April 16, 2008 and cancelled on an unknown date.

As the timing of Agra's actions show, it did not "expedite" its responses to these 9 change orders, rejecting them weeks, not days, after they were submitted. At the same time, it is apparent that Central performed the work before it submitted the change order and attempted to paper up the change order after the fact. In itself, this would be a basis for Agra to reject the change order. Likewise, if the change order proposed work that Agra believed was within Central's scope, it would be appropriate for Agra to reject it. Unlike the water treatment system, there was a lack of direct evidence that Agra directed Central to perform the work that is described in these 9 change orders without obtaining an approved change order. Finally, sitting here today, the Court is not in a

75

position to address the "merits" of Agra's rejection or cancellation of these disputed change orders without more evidence concerning the nature of the work and the reasons for Agra's rejection or cancellation, all matters that lay within Central's burden of proof. As noted above, Central could have invoked the dispute resolution procedures available to it under the contract to resolve the merits of the change orders or it could have declined to perform the work. Moreover, with the current state of the evidentiary record, the Court cannot conclude that Agra breached the implied covenant of good faith and fair dealing with respect to these "disputed" change orders.

Even if Agra's technical noncompliance with its duty to respond promptly to the change order submittals is a breach of the change order provisions, it does not arise to the level of a material failure to perform that would discharge Central's obligation to comply with the change order process. To hold otherwise would be to allow Central to commence and complete unapproved work at will and then demand payment for it in violation of the agreement. As succinctly explained by Shank at trial, the change order process serves an important function. It enables Agra to ascertain whether the change order is for out-of-scope work and to review the proposed cost. This allows Agra to determine whether to use the claimant or another contractor for the added work. At the same time, the change order process also protects subcontractors. They have no duty to proceed with change order work without securing an approved change order. Thus, by complying with the change order process set out in the contract, Central could have avoided the risk of performing the work and not getting paid.

The Court concludes that Central cannot rely on Agra's technical breach of the change order process to excuse Central's failure to follow the contractual procedures under general contract law. Agra had no duty to approve, timely or belatedly, change orders for which the work had already

76

been performed. Under these circumstances, Central should not be rewarded for its own failure to comply with the change order process. Central cannot recover on its $149,000 claim for the nine disputed change orders.

        h.     Does Central's noncompliance with the claims and change order process disqualify it from being compensated on its impact claim?

In this section, the Court considers whether Central may nonetheless recover on its impact claim even though it did not comply with the claims and change order provisions set forth in the contract. As noted in the opening section of the conclusions of law, in order to recover for a breach of contract, Central must show that it performed all terms and conditions required of it under the contract or that its performance was excused. Central advances what it terms a course of dealing theory by which Agra by its actions and knowledge of Central's delay claims waived or excused Central's compliance with the delay claim and change order process. The Court disagrees.

An Iowa appellate court has held that the requirement of a written change order is not of the essence of a contract, but rather "is a detail of the performance."[259] In *Central Iowa Grading, Inc. v. UDE Corp.* the Iowa Court of Appeals held that a change order requirement may be waived by the owner's knowledge of, agreement to, or acquiescence in extra work. Similarly, the court held that a course of dealing that repeatedly disregards the written change order requirement and a promise to pay for work that is orally requested by the owner and performed can suffice to waive the written change order requirement.

The facts of *Central Iowa* merit some explanation. In that case, the defendant contractor entered into a $50,000 lump sum subcontract with plaintiff for the site grading work on a housing

---

        [259] *Central Iowa Grading, Inc. v. UDE Corp.,* 392 N.W. 2d 857, 860 (Iowa App. 1986), *citing Berg v. Kucharo Construction Co.,* 237 Iowa 478, 489, 21 N.W. 2d 561, 567 (1946).

77

project. There is no indication in that case that either the owner-contractor or contractor-subcontractor contracts were memorialized by AIA contract documents as employed in the instant case. Nor does the opinion identify the presence of anti-waiver provisions in the contracts or the means by which the contracts could be modified. Both the prime contract and subcontract, however, contained a written change order requirement for extra work outside the contract. The evidence in *Central Iowa Grading* consisted of the owner's and contractor's approval of three change orders well after the subcontractor performed extra work not covered by the subcontract. In addition, the subcontractor performed extra work at the contractor's oral direction, with the contractor's assurance that written change orders would be forthcoming. When the subcontractor filed suit against the owner and contractor to foreclose its mechanic's lien and recover some $38,000 in extra work it performed without a change order, the defendants argued that the subcontractor was not entitled to a lien for the extra work performed without written change orders. The Iowa court recognized that the change order requirement could be waived by course of dealing, but disallowed the subcontractor's claim for $38,000 of extra work.

> In the present case, Nelson-Roth [the owner] arguably waived the written change order requirement. The record reflects that Nelson-Roth approved three change orders well after the related extra work was performed. This course of dealing would indicate that the contract provision requiring prior written approval was disregarded. Even so, it does not follow that CIG [the subcontractor] should be compensated for all extra work performed.

> *A waiver of a written change order requirement does not entitle a subcontractor to perform extra work without any approval whatsoever.* The general rule is that recovery can be had for extra work only if it was performed with the knowledge or consent of the adverse party.

> The present record does not support a finding that [the owner] knew of or consented to the extra work performed by [the subcontractor]. The scope of and payment for the extra work *was agreed to* by [the subcontractor] and [contractor]. There is no indication that [the owner] knew of this agreement until well after the

78

work had been completed.  Nor is there evidence indicating that [the owner] consented to payment.  In fact, the company stated in correspondence that it did not consider the work to be an extra to their contract.[260]

Central's impact claims stand on very different footing.  While Agra knew of the late valve delivery delays, it contended that nearly all of the valves could have been installed upon delivery prior to the March 6, 2008 substantial completion date and was therefore part of Central's scope of work.  Agra assisted and encouraged Central in submitting delay claims by sharing Agra's delay claim form with Central.  In itself, this conduct evidences Agra's intent that Central comply with the claims and change order provisions, not disregard them.  Agra did not acknowledge the validity of those claims or advise Central that no change order was required.  Agra became aware of Central's claim of $58,000 for out-of-sequence work when Central presented its impact claim to Agra in May of 2008, after the out-of-sequence work had been performed.  There is no evidence before the Court that Agra directed Central to proceed without an approved change order or agreed, verbally or in writing, to pay Central for the out-of-sequence work.  Even if Central had given a timely Delay Notice and made a Delay Claim for this out-of-sequence work, there is no evidence that Agra dispensed with the change order requirement before Central proceeded with the work.  And unlike in *Central Iowa*, Agra's course of dealing with respect to after-the-fact change orders is exemplified by its actions on the 9 disputed change orders discussed above – they were rejected.

Central's claim for accelerated labor is somewhat similar.  Agra contends that it did not accelerate Central's work in July of 2007 when Bob Shank issued his ramp-up order.  It contended that Central was not adequately manning the project to complete its scope of work by the completion date.  Regardless of whether the ramp-up order was an "acceleration," there was no agreement

---

[260] *Id.* at 860.

between Agra and Central that Agra would pay for the accelerated labor. And Agra submitted no claim or change order to put Agra on notice of the cost of the accelerated work, until it presented its impact claim in May 2008, long after the extra costs were incurred. There was no agreement between Agra and Central that a change order would not be required.

In short, while there is ample legal authority that written modification provisions may be waived orally or by course of dealing, Central has failed to meet its burden of proving such a waiver whether orally or by course of dealing.[261] In addition, the contract here also contained anti-waiver provisions. Agra's "action or failure to act" was not an approval of or acquiescence in a breach of the terms and conditions, "except as may be specifically agreed in writing."[262] Any claimed waiver by Agra of a contract condition or provision or a party's rights thereunder was required to be in writing and signed by the party purporting to waive the term, condition or provision.[263] No such written waiver of the change order or claims process exists in this case, and that deficiency is fatal to Central's ability to avoid the express contractual requirements for change orders and claims.

### 3.    Water Treatment Claim

Finally, the Court addresses Central's claim for its unpaid water treatment costs incurred without an approved change order. This claim stands apart from Central's other claims and is amply supported by evidence that Agra and the owner waived the change order requirement. Alternatively, the Court concludes that Central may recover these costs under a *quantum meruit* theory.

---

[261] *See In re R&D Contracting, L.L.C.,* 383 B.R. 890, 898 (Bankr. E.D. Mich. 2008) (applying Michigan law); *Hall Contracting Corp. v. Entergy Services, Inc.,* 309 F.3d 468 (8th Cir. 2002) (applying Arkansas law).

[262] Ex. 4, § A.13.4.2.

[263] Ex. 4, § 13.6.1 and § A.13.4.2.

The water treatment facility was not in the original scope of Central's work. The parties were a year into the Superior project before the water treatment facility was added by the owner GPRE. In January of 2008, change orders were submitted before the design of the facility was completed and after open-ended change orders were submitted and rejected, Central and Agra submitted new lump sum change orders.[264] When GPRE approved Agra's change order 56, Agra provided it to Central to persuade it to start the underground piping work before Central's change order 16 had been approved by Agra. This act, indirectly if not directly, constituted Agra's assent for Central to proceed with work on the water treatment plant without an approved change order. Central then submitted change order 18 for the above ground piping and it was approved. In an early February construction meeting, GPRE's project representative, Scott Flynn, directed Central, Miron, and VanErt [the subcontractors on the water treatment building] to "make sure they are keeping track separately of expenses for the water treatment building."[265] By March, Central had in hand the design for the water treatment facility and knew that its cost of the work would exceed the approved lump sum change orders. As the March 6, 2008 completion date loomed, Flynn directed Central and other subcontractors to keep going on the work and assured them that they would "be taken care of." He instructed the subcontractors to get the work done and they would worry about change orders later.[266] That Flynn gave these directives was corroborated by the

---

[264] By all accounts, Agra recognized that Central did not have the final design on the water treatment facility to enable Central to accurately bid and submit change orders for this out-of-scope work. In order to move the water treatment work along, however, Chipman essentially told Central to do the best it could in coming up with its costs. *See* Exs. 120, 121.

[265] Ex. 125.

[266] The Court also suggests that submitting a change order after the fact impliedly assumes that the subcontractors would submit their cost for the extra work (*i.e.* time and materials). How else could a subcontractor document its costs for the extra work?

testimony of Bobby Myers, Bob Shank, and Jason Baertsch, the electrical subcontractor. Central submitted change order 18A to convert the water treatment work to a time and materials basis, consistent with Agra's change order 51 to GPRE wherein it was noted that "costs for labor, material, and equipment will be tracked separately from balance of the project."[267]  If the water treatment facility were to continue on a lump sum basis as specified under change orders 16 and 18, there would be no reason to track labor and materials.  When Myers advised Shank and Chipman in April that Central was "over budgetary T/M Price" and asked how Central should proceed, Chipman directed Myers to submit a change order for the anticipated costs above the amount in approved change order 18 and it would be submitted to GPRE. Chipman never challenged or corrected Myers regarding his belief that Central's work on the water treatment facility was now on a time and materials basis.

Unlike the owner in the *Central Iowa Grading* case discussed above, GPRE's project representative Flynn directed Central to continue to perform work on the water treatment piping without a change order and told it to keep track of its expenses on the water treatment building. Both GPRE (through Scott Flynn) and Agra knew Central and other subcontractors continued to work on the water treatment piping without change orders (under the assurance of later change orders) and that it was additional work beyond the work covered by the lump sum price change orders 16 and 18.  At a minimum, they acquiesced in Central's extra work.  The Court therefore concludes that Agra and GPRE, by their conduct, waived the change order requirement for Central's work on the water treatment facility and  agreed to pay Central for the additional cost of the work.

---

[267]  Ex. 127.  Chipman signed off on Change Order 18A in May, but an Agra officer did not.

Alternatively, the Court concludes that Central is entitled to recover the $242,535 additional costs it incurred to complete the water treatment facility under a *quantum meruit* theory.[268]  To prevail on *quantum meruit* Central must show (1) that services were provided under such circumstances as to give the recipient reason to understand (a) that they were performed for recipient and not some other person, and (b) that they were not rendered gratuitously, but with the expectation of compensation from the recipient; and (2) that the services were beneficial to the recipient.[269] There is no doubt here that when Central and Agra entered into the Subcontract in 2006, the water treatment facility was not in the picture and not contemplated in the Subcontract.  It is equally clear from the testimony at trial that sufficient quantity and quality of water is critical to operate an ethanol plant and that GPRE was eager to incorporate the water treatment building into the project. Change orders were approved to alter Central's scope of work and add the piping on the water treatment facility to the Subcontract.  Agra clearly knew that Central was performing the work for it under the Subcontract.  GPRE clearly knew that Agra had subcontracted the piping work on the water treatment work to Central.   There is also no question that Agra knew Central expected to be paid  for the work.  The real element in contention is whether Central's unpaid services benefitted Agra.  Agra contends they did not because it was not the owner of the ethanol plant, and because its own change  order 85R submitted to GPRE for the additional costs was never approved or paid.

---

[268]  The existence of the express contract between Central and Agra does not bar Central's  *quantum meruit* theory.  Central can assert both these claims, or in the alternative.  It cannot, however, recover the water treatment costs under both the Subcontract and *quantum meruit. See Union Pacific R. Co. v. Cedar Rapids and Iowa City R. Co.,* 477 F. Supp. 2d 980, 997 (N.D. Iowa 2007).

[269]  *Roger's Backhoe Serv., Inc. v. Nichols,* 681 N.W. 2d 647, 652 (Iowa 2004); *Iowa Waste Sys., Inc. v. Buchanan County,* 617 N.W. 2d 23, 28-30 (Iowa App. 2000) (describing *quantum meruit* as an implied-in-fact contract to pay the reasonable value of services rendered).

Thus, Agra's contract price with GPRE was never increased relative to the work corresponding to the unapproved change order and the additional costs beyond Central change orders 16 and 18 sought here. The Court concludes that the unpaid water treatment work did benefit Agra. The work that Flynn directed Central to do on the water treatment facility benefitted Agra in the sense that Agra knew it was being done in furtherance of Central's subcontract work for Agra. Finally, Agra benefitted in another way. It was able to get $7.0 million out of GPRE upon completion and close out of the Superior project. That we can not trace the water treatment costs from the $7.0 million settlement does not matter as much to the Court as the fact that Agra relied on the unapproved and unsettled change orders as a basis for negotiating the settlement with GPRE. That alone demonstrates Agra's recognition of their exposure for Central's work. Accordingly, Central is entitled to recover its water treatment costs claim of $242,535 under the alternative theory of *quantum meruit.*

Finally, the Court has also considered whether Central may recover the additional water treatment costs on another alternative basis: the equitable restitution-based theory of unjust enrichment.[270] If the Subcontract governed Central's extra work on the water treatment facility, it had an at-law remedy to enforce its claim and this would bar the equitable unjust enrichment claim.[271] Here, Agra contends that Central obtained no executed change order for the extra work apart from Change Orders 16 and 18 and therefore, the Subcontract was not modified beyond these two change orders. The Court concludes that in the absence of a change order for the "extra work"

---

[270] *Iowa Waste Systems, Inc., supra* at 30-31 (distinguishing *quantum meruit* and unjust enrichment).

[271] *Iowa Waste Systems, Inc., supra* (seeking to recover costs incurred after the parties' operating agreement had been terminated).

for which Central seeks to recover, Central had no remedy at law to enforce the Subcontract as to this "extra work." Thus, the unjust enrichment claim is not barred. Similar to the *quantum meruit* claim, Central must demonstrate that its extra work on the water treatment plan conferred a benefit upon Agra to Central's detriment, that Agra had an appreciation of receiving the benefit, and that Agra accepted and retained the benefit under circumstances making it inequitable for there to be no return payment for its value.[272] The Court concludes all of these elements are present here. Without completion of the water treatment facility by Central, Agra would have been unable to certify its substantial completion of the contract with GPRE. Agra not only recognized the benefit of the completed water treatment building, it advanced Central's costs to negotiate a $7.0 million settlement with the owner GPRE. And as in the case of Central's *quantum meruit* claim, it makes no difference that the costs of the extra work on the water treatment facility cannot be directly traced to the $7.0 million settlement. What is important is that Agra used Central's extra work and costs on the water treatment plant to close out its contract with GPRE and never repaid to Central any of the value of that extra work from the settlement proceeds. It is inequitable for Agra to pay no value for that benefit. Central is therefore, alternatively entitled to the return payment of its extra costs incurred to complete the piping on the water treatment facility on the basis of unjust enrichment.

## V. PLYMOUTH PROJECT – FINDINGS AND CONCLUSIONS OF LAW

### A. Performance of the Plymouth Project

#### 1. Delays

By the time Agra contracted with Central for the piping subcontract at the Merrill, Iowa plant in mid-October, 2007, both Agra and Central had experienced numerous delays and difficulties at

---

[272] *Id.* at 30 (elements of unjust enrichment claim).

Superior and that project was sorely behind schedule. Delta-T, the same dilatory design contractor who hampered construction at Superior, was to supply the design technology for the Plymouth project, too. Nevertheless, Central agreed to proceed with the sister Plymouth plant and signed the Plymouth subcontract.[273]

The Plymouth Project and Superior Project were also sister plants in the sense that they both suffered from the same Agra/Delta-T delays. Agra's Project Manager Al Koch informed Delta-T on September 8, 2007 that Agra was most concerned with equipment/systems deliveries that had slipped, as reported on the material status report.[274] Nevertheless, five days later, Koch told Bobby Myers that Delta-T had promised their Plymouth performance would be better than on Superior, but did not mention that Koch had already complained about Delta-T's untimely procurement of Plymouth components.[275] Those communications preceded by only a few days Agra's award of the Plymouth subcontract to Central.

Even at this early stage of the project, late valve and vessel deliveries were hindering the Plymouth effort. On October 17, 2007, just two days after Central signed the subcontract, Bob Shank advised Delta-T that the Plymouth Energy board of directors had expressed concern with the valve and vessel deliveries.[276] On October 22, Agra sent Delta-T a delay notice for late delivery of

---

[273] The Court notes that Superior project had an initial completion date in November of 2007, giving Central some 11 months to perform its scope of work. That substantial complete date was eventually extended 3 months and the start-up of the plant did not occur until the summer of 2008, a full 6 months later than contemplated. Despite the length of time it took to complete Superior, the Plymouth subcontract called for Central to complete its work in an even shorter period, 7 months.

[274] Ex. 160.

[275] Ex. 161.

[276] Ex. 164.

19 pieces of equipment.[277]  Two days later, Bob Shank asked Agra Vice President Dave Marcott to put Delta-T on notice for late delivery of additional pieces of equipment.[278]  Consistent with its conduct on the Superior project, Agra failed to share with Central its concerns over Delta-T late deliveries.[279]  Central mobilized to the Plymouth site on November 8, 2007, only to quickly find that progress at Plymouth was beset by the same issues manifested at Superior.

Work on predecessor activities to Central's piping was also hampered by the severely hard winter of 2007-08.  Plymouth Energy's view of the work progress in mid-January 2008 was articulated in a January 19 e-mail from Plymouth Energy representative Dave Hoffman to Agra President Pat Hinner in which he described -21 degree wind-chills at the site and questioned why so many delays had already occurred.[280]  Agra's site superintendent at Plymouth, Erick Soder, agreed that the weather and Agra's slow change order approval process combined with incomplete process drawings and late equipment delivery delayed everything on the Plymouth site.

Agra and Delta-T continued to struggle to get valves and instruments to the Plymouth site in the late winter and spring of 2008.[281]  By e-mail dated February 22, 2008, Dave Burgess informed Delta-T that the missing valves needed to arrive on site as soon as possible and that Central was having to block out valves.  A week later, Dave Burgess told Delta-T that issues with substitute valves would cause great additional cost and impact the schedule.  Soder believed that Central had

---

[277]  Ex. 166.

[278]  Ex. 165.

[279]  *See* Ex. 158, § 3.1.1 and § 3.2.1.

[280]  Ex. 173 [emphasis added].

[281]  Ex. 182-184.

87

to block out upwards of 60 percent of the valve locations. Agra's project managers were well-aware of the problems being caused Central by Delta-T's ongoing failure to perform timely.

Agra's home office was also intimately aware of delays within its scope of responsibility that were affecting the Plymouth piping work. Agra Procurement Director Russ Wende testified that everyone at Agra in a position of responsibility for Plymouth knew that late valve and equipment deliveries were having a major impact on Central's work. Agra was tracking on a material status report spreadsheet the ordering and delivery of vessels, equipment, and valves.

In late April 2008, Agra continued to put Delta-T on notice for missing valves and instruments.[282] On April 22, 2008, Agra declared Delta-T in default for "missed milestone dates" on "valves, gasketing, and pressure instruments and temperature indicator devices" – all items incorporated by Central into the piping runs. As of April 28, 2008, Agra identified 243 valves that it believed had not even been *ordered* for Plymouth, even though Central's subcontract completion date was a month away. Bob Shank urged Delta-T to order the valves immediately, with the admonition that he did not want the Plymouth Project to be another project that was late due to late deliveries. Burgess admitted at trial that the number of late deliveries on the Plymouth Project was higher than what usually occurs in the ethanol plant construction industry. At the end of the Plymouth Project, Agra prepared and presented a $4.0 million claim against Delta-T for late deliveries of valves and equipment.[283]

Missing valves plagued this project until its conclusion. In an e-mail dated June 20, Russ Wende reminded Delta-T that Agra was continuing to procure items for Delta-T and sarcastically

---

[282] Ex. 187-190

[283] Ex. 252-253.

asked if Delta-T still had a purchasing department.[284]  Even after Central left the job in July, Agra continued to experience significant problems with Delta-T through the fall of 2008.  By e-mail dated August 18, Soder informed Dave Burgess that there were still a number of valves missing from the site.[285]  On August 25, 2008, Agra sent another delay notice to Delta-T for missing valves.[286]

Wanzek, the mechanical contractor who finished Central's scope of work on the Plymouth piping work, experienced similar problems with missing valves and materials.  On August 26, 2008, Wanzek sent Burgess a letter stating as much.[287]  Wanzek continued to be delayed by missing materials in September 2008.[288]  Wanzek remained on the Plymouth site through November 2008, when Agra ordered Wanzek to perform $176,000 worth of re-designed piping work on the cooling towers.[289]

### 2.      Change Orders

As had happened (and, indeed, was contemporaneously happening) at Superior, Agra's handling of change orders remained less than responsive.  Central took to drafting its own change orders and directing them to Agra for approval.  On March 4, 2008, Burgess instructed Central (by e-mail) to stop sending change orders:

> The change orders that you are sending need to stop.  All change orders will come from Agra. . . . Central can request a change order.  The contract under Section 5.2

---

[284]  Ex. 210.

[285]  Ex. 237.

[286]  Ex. 241.

[287]  Ex. 238.

[288]  Ex, 244, 246.

[289]  Ex. 249.

89

specifies that Central needs to supply to Agra written copies of a claim for adjustment. This is not a change order. You will receive the change order from Agra.[290]

Thereafter, in March and April of 2008, Central sent delay claims to Agra for (I) late completion of predecessor concrete work; (ii) late completion of predecessor steel erection work; (iii) late construction of the centrifuge building; (iv) late delivery of valves; and (v) late erection of the mole sieve structure and a cooling tower.[291] Agra never provided a response to Central for any of these delay claims and never issued any change orders for the delay claims, notwithstanding Burgess' direction to Myers. However, Central remained on site and continued to work.

The Court's review of the Plymouth change order log maintained by Agra for Central's work reveals that Central requested 27 change orders, several of which specifically dealt with missing valves.[292] Only ten of these were approved by Agra, increasing the price of the work by about $20,000 and extending Central's time of work by 14 days, to May 29, 2008. Only one of two change orders specifically addressed at valve placement and installation was approved. In fact, change order 26, requested by Central on June 23, 2008, was not dealt with and rejected until September 12, 2008, long after Central had demobilized and departed.

### 3. Manning the Plymouth Project

On May 12, 2008, Central and Agra management met at Agra headquarters in Merrill, Wisconsin to discuss Central's claims and proposed change orders that mostly concerned the

---

[290] Ex. 297. Burgess' interpretation of how the process was to work under the Plymouth Subcontract, *i.e.*, that Central was to submit written claim notices that Agra would then respond and render into change orders, conforms to the Court's interpretation of the Subcontract's provisions. *See* Ex. 158, § 5.2.

[291] Ex. 186, 191, 199.

[292] Ex. 595.

Superior job.[293]   Agra then issued a delay notice of its own to Central concerning its work at

Plymouth.   On May 20, Burgess wrote to Myers that Central was not sufficiently manning the

Plymouth project and that the project was incomplete.[294]   This was the first of multiple letters to

Central concerning Agra's claim that Central was not properly manning the Plymouth Project and

advising Central it should "double" its work crew and "add a night shift," and contact Agra to

discuss said concerns.[295]   The tone of this series of letters suggests that relations had significantly

deteriorated at this point and that lawyers had become involved.[296]

> Burgess wrote Bob Shank on June 6 that--
>
> Bob [Myers] Sr. from CSMI says the contract is what it is and they are going to
> follow it.  For this reason the attached letter needs to go out.  *If we do not they will
> be able to enforce the delay notice they have sent us.*  I have printed one out and
> signed it and left it with Annie.  This should not wait until I get back.  We need to
> talk about this.[297]

The "attached letter" is a draft Notice of Delay dated May 19, 2008 warning of the imposition of

liquidated damages under § 3.4 of the subcontract.[298]   That subsection requires the contractor to give

the subcontractor a three-day written notice to cure a default as a precondition to the contractor's

---

[293]   It was at the May 2008 meeting that Central presented its sizeable impact claim on the
Superior project.

[294]   Ex. 197.

[295]   Exs. 599-600/Exs. 201, 206.

[296]   Agra procurement director Russ Wende testified that Agra's senior management
reviewed this project weekly, always with litigation counsel present.

[297]   Ex. 299 [emphasis added].

[298]   The Court notes that under the Plymouth Subcontract, Central was not liable for
liquidated damages if the delay in substantial completion is through no fault of Central or causes
that are outside Central's scope of work. *See* Ex. 158, § 3.3.1

acting to cure the default itself and charge the cost of same back to the subcontractor.  The May 19

letter was never sent, but its drafting and Burgess' comment that Agra needed to give such a notice

in order to trump Central's pending delay notice, suggest that Burgess and Agra considered

themselves on a war-footing with Central by the middle of May.

By letter dated May 30, Central notified Agra of its claim for Plymouth Project extended-

duration costs, requested an updated schedule, and set forth its new procedure for dealing with still-

missing valves.[299]  Agra responded on June 6 – only 4 days after the release of the rev. 2 P&IDs –

with a letter declaring Central in default of its subcontract for failing to complete the work by the

"agreed completion date of May 15, 2008."[300]  According to Burgess, the rev. 2 P&IDs did not

significantly impact Central's work.  The June 6 letter sent by Agra was a modified version of the

draft notice of delay letter sent previously by Dave Burgess to Bob Shank.   The June 6 letter serves

formal notice of delay under § 3.4 of Central's failure to complete its scope of work.

On June 18, the same day that Agra issued the revised construction schedule Burgess e-

mailed Myers expressing concern regarding Central's reduction in manpower and requesting

Central's plan to meet the schedule.

> CSMI has been involved in the schedule process since the beginning of this project.
> Agar [sic] has been asking for a manpower loaded schedule from CSMI and has not
> received one to date. . . . I have requested and not received your recovery plan on
> how you are going to finish this plant.  Your supervision has requested a crew of 75
> people and today you are just over 40.  Your crew size has only hit 60+ for a few
> days.  This is crunch time.  I am used to seeing piping crews in the 75-100 or more
> at this time. working two shifts.  You have many areas that can be worked in but are
> lacking crews. . . . I would suggest that you immediately double your crew and add

---

[299]  Ex. 199.

[300]  Ex. 201.

a night shift. . . . Please get back to me with your recovery plan.  Time is of the essence.[301]

This e-mail followed the June 17 weekly contractors' meeting noting manpower issues with the three largest subcontractors, including Central.[302]  Agra's site superintendent, Soder followed up the contractors' meeting with an e-mail to Bob Shank and Dave Burgess, indicating that Central needed more fitters and welders.  Central's site superintendent conveyed to Soder that he could not get the necessary manpower to finish the job.[303]

On June 24, 2008, Agra sent to Central a second delay notice under § 3.4 contending that Central had not provided the needed manpower, equipment, and tools to complete its scope of work, again requesting a plan for recovery on the Plymouth Project, advising that Agra now had the right to remove and reassign portions of Central's scope of work, and asking Central to resolve the issues.[304]

Central responded on June 27 proposing to increase the day shift manpower and lengthen the work day and begin a night shift starting the week of July 7.[305]  The June 24 weekly contractors' meeting minutes also indicate that Central would start a night shift after the July 4 weekend.[306]

### 4.    Central's Payment Application No. 10

---

[301]  Ex. 206.

[302]  Ex. 204.

[303]  Ex. 207.

[304]  Ex. 212.

[305]  Ex. 215.

[306]  Ex. 211.

93

On June 30, 2008, Agra denied Payment Application No. l0 (Pay App 10), a monthly progress payment application filed by Central. Pursuant to § 11.6 of the Subcontract, progress payments were based upon the subcontractor certifying a percentage of completion that is attributable to each line item work activity and the extent to which that item has been further completed during the pay period. Central submitted this application on June 20, 2008.[307] This application consisted of the completed application form that summarized the requested payment of $872,389, a spreadsheet containing the schedule of values of each line item task and a percentage of completion attained during the period, spreadsheets of employees' hours that referenced work done in connection with change orders 21, 23 and 25, other daily time sheets and summaries, and the field staff approval form signed by Erick Soder. No lien waiver was attached, but neither did Central make a claim for reimbursement of work or materials supplied by third-party contractors or vendors. Central certified that its work was 92% complete (85% complete from previous applications plus 7% complete on the current payment application).

On June 30, 2008, the last day that Agra could reject Pay App 10 under the 10-day time limit set out in the Subcontract, Agra sent Central a letter indicating that Pay App 10 had been partially rejected because "Dave Burgess the Project Manager does not agree with the percents represented on application #10" and because "[t]he three change orders do not have proper support. There should be timesheets showing actual hours versus a spreadsheet with the information."[308] Agra approved

---

[307] Ex. 288. According to Burgess, prior to the June 30 letter he verbally requested Bobby Myers to provide a "mark-up" highlighting the P&IDs to show what was complete as was common for mechanical contractors to provide. Burgess waited as long as he could before partially rejecting Pay App 10.

[308] (Ex. 607/Ex. 217-B.). *See* Ex. 158, § 11.6 for time limits on Agra to reject a payment application or waive its right to reject.

94

payment of $96,138 on Pay App 10 but zeroed out the balance of the amount sought under the application. Agra asserted that this partial rejection was based on Burgess' view that insufficient work had been completed to support Central's claim that its work was 92 percent complete. Burgess did not review a mark-up of the P&IDs, but did confer with Soder and Bob Shank before marking up Pay App 10 and approving the sum of $96,138.[309] Burgess requested Central to provide a mark-up of the P&IDs to substantiate the completion percentage. Central did not provide the requested information.

Burgess' objections to Pay App 10 were based on his visual inspection of the project and his comparison to the Superior Project which was in "start-up," when he received Pay App 10. To support Burgess' observations, Agra introduced into evidence comparative photographs of the Plymouth plant taken when Central walked off the job one week later versus photographs when complete.[310] It is not clear whether Central performed any further work between partial rejection on June 30 and walk off on July 7, but the photographic evidence clearly depicts a plant with substantial piping and mechanical work remaining as of July 7. In addition, Burgess had in hand contemporaneous written communication from Central in which the elder Myers indicated that 20 weeks' of pipe work at the contracted pace remained to be done.[311] Burgess felt this was this inconsistent with a claim of 92 percent completion. This letter, dated June 27, was written in response to Burgess' delay claim letter of June 24 requesting a manpower-loaded schedule that would support an initial grind date of August 29, 2008 to start up the plant. In that letter, Myers

___

[309] Both Soder and Burgess indicated that it was not uncommon for them to disagree on completion percentage.

[310] Ex. 623.

[311] Ex. 604/Ex. 215.

95

asserts that Central work had been continuously delayed by matters beyond its control and that Agra had only provided a revised schedule on June 18. Central contends that injection of the delay claim discussion into the pay application process suggests that Agra intended to withhold this progress payment as leverage in the broader dispute.[312]

Agra itself represented to the owner that most of the work claimed by Central was done. Dave Burgess prepared and sent to the owner a worksheet of Agra's estimated Payment Application No. 29 (Pay App 29) the same day he partially rejected Central Pay App 10.[313] On the draft application, Burgess sought roughly $785,000 for the twelve work activities he had zeroed out on Central Pay App 10.[314] Two days later, on July 2, 2008, Dave Marcott certified and sent to the owner Agra Pay App 29.[315] Marcott testified that he was intimately involved in the preparation of Agra's application and that he knew Burgess had zeroed out line items that Agra in turn claimed were completed. Agra's "explanation" of this is, to say the least, interesting.

In an attempt to explain the apparent inconsistency of Agra's Pay App 29 with its position on Central's Pay App 10, Burgess testified that the statement on Agra's Pay App 29 that an activity was 92% complete really does not mean the activity was in fact 92% complete. Instead, Burgess says that the owner and Agra knew that only the completion percent *added that month* was accurate, not the aggregate percentage completed. This is different from his e-mailed statement to the owner's representative on July 18, 2008, wherein he stated "Due the actual percent complete during that

---

[312] Ex. 202.

[313] Ex. 300.

[314] The work activity numbers in the schedule of the valves from Central's pay application trace through to the work activity numbers in Agra's schedule of values to the owner.

[315] Ex. 220.

96

month the application like those before it represented an accurate % complete."[316] He further states "The percents complete were stated accurately in this application as well. The percent complete stated by Agra stated accurately represents the work completed to the best of my knowledge." For example, Burgess made the following statement in regards to Task 471 Process Piping (Installation):

> Task 471 Process Piping (Installation) was stated to PE [Plymouth Energy] at 20% bringing it to 80%. This work is in the Utility Maintenance area. The blow downs are in. The main headers are in. The Steam piping in the Process Piping is in process. The water treatment is not part of this scope. *80% is an accurate number.*[317]

This contradicts the testimony of Agra's vice president Dave Marcott who stated that, in general, a contractor's application to an owner for payment may not reflect the actual percentages of completion of line items that correspond to the subcontractor's percentages. But he also admitted that under the Plymouth Subcontract Agra could not bill the owner for amounts that it did not intend to pay Central. Marcott was unequivocal in his statement that his main concern in dealing with Central Pay App 10 and Agra's Pay App 29 was cash flow. "From what I do with Agra, it's all about the money."[318] Marcott explained that in early 2008 a dispute ensued between Agra and Plymouth Energy about the availability of a $5.0 million contingency fund to apply toward Agra's costs in excess of its schedule of values with the owner. Plymouth Energy refused to release the contingency funds available until the end of the project, which in turn affected Agra's cash flow. According to Marcott, not far into the project and payment applications, Plymouth Energy refused to pay the contingency portion of Agra's payment applications and reduced line item completion

---

[316] Ex. 229.

[317] Ex. 229.

[318] 5 Tr. 92:13

percentages, including its Pay App 29.  It did not pay Agra the amount sought in its applications and because Agra was still required to pay Central's applications, Agra was soon behind.

Marcott explained that the schedule of values for a line item task may differ between Central and Agra, so that the percentage completion applied to a differing value for a line item task may result in Central getting paid a different sum than Agra would receive from Plymouth.  The underfunded contingency fund should have been in place to cover this situation.  The Court specifically asked Marcott, "If Agra said to owner [line] 226 is 90 percent done, that is not necessarily the same as Central say to Agra line 226 is 90 percent done?"  Marcott answered, "Correct."[319]  Because of Plymouth Energy's refusal to make the contingency fund available Marcott told the Court that if Central is charging for 92 percent of their work, he, as chief financial officer, needs to find some way to charge the owner for the 92 percent so that Agra is able to manage the cash flow and that this need justified the statement on Agra Pay App 29 rather than any actual completion numbers.  At the time Agra partially rejected Central's Pay App 10, it was $400,000 behind on cash flow – meaning that it had paid Central $400,000 more than it had collected from Plymouth Energy.

The Court reviewed Central's Payment Application Nos. 1-9 on the Plymouth project.  Agra paid all of those applications, even though it was behind with the owner, dispelling Central's notion of inappropriate leverage by Agra.[320]  Those applications are shown on the table below.

| Pay App # | Date | Amount | Approved | Date Paid |
|---|---|---|---|---|
| 1 | 10.31.07 | $1,008,959.00 | 11.01.07 | 12.04.07 |

---

[319]  5 Tr. 87:7-10.

[320]  Ex. 626.

| | | | | |
|---|---|---|---|---|
| 2 | 11.01.07 | $1,175,054.00 | 11.05.07 | 11.27.07 |
| 3 | 11.30.07 | $1,583,273.00 | 12.04.07 | 12.28.07 |
| 4 | 01.04.08 | $883,775.00 | 01.07.08 | 02.08.08 |
| 5 | 02.04.08 | $1,238,570.00 | 02.11.08 | 03.18.08 |
| 6 | 02.25.08 | $700,296.00 | 03.10.08 **approved $657,918** | 03.21.08 |
| 7 | 03.25.08 | $1,289,709.00 | 03.28.08 | 04.16.08 |
| 8 | 04.21.08 | $1,182,971.00 | 04.23.08 | 05.23.08 |
| 9 | 05.19.08 | $933,018.00 | 05.23.08 | 06.26.08 |

Burgess partially rejected other payment applications and required correction of challenged items.[321]

Agra typically *paid* Central on its payment applications 30-40 days from the date of Central's application.[322]  The last payment application approved and paid, Pay App 9 in the amount of $933,018, was dated May 19, 2008, approved by Agra on May 23, and paid June 26, within the 45 days allowed under the Subcontract.  The evidence shows that some ten days later, rather than supply the documentation requested by Agra to justify the completion percentage on Pay App 10, Central walked off the job.

### 5.     The "Walk-Off"

By the time Agra partially rejected Pay App 10, the situation between Agra and Central had deteriorated during June due to the parties' inability to agree on the manner in which Central would address Agra's staffing and manpower demands to get the project completed and the plant up and

---

[321]  *Id.,* Pay App 4 (rejected because insulation materials were not on site and resubmitted); Pay App 6 (disputed completion percentage regarding outside pipe racks). *See also*, Ex. 597.

[322]  Ex. 626.

running. As of June, the Plymouth Project was past the contracted substantial completion date. As noted previously, Central made several requests for an updated schedule, noting that completion was "several months away" and Agra had sent delay notices contending that Central had not met the substantial completion date because it had not sufficiently manned the project and sought Central's plan to complete the project.[323]  On June 18 Agra issued an updated schedule that slashed the durations (schedule time allowed) for many of Central's piping activities in order to make an "initial [corn] grind for production" date of August 29th.[324]  Agra solicited from Central a "recovery plan" to complete its piping work to support a grind date of August 29.[325]

On June 24, Agra sent a second delay notice to Central because it had not responded or communicated since Agra's previous delay notice. In this delay notice Agra threatened to "de-scope" and remove Central's work.[326]  In the elder Myers' June 27 letter back to Burgess, Myers stated that Central had "about 20 weeks of piping work left at our contracted pace, which would support an initial grind date of November 12th."[327]  Bobby Myers testified that this letter was intended to inform Agra that Central had twenty weeks available under the Plymouth Subcontract to complete the remaining piping work. Central estimated that in order to staff-up to meet the August 29 deadline, it anticipated cost of an additional $258,300 per week for 8 weeks starting July 7 to achieve Agra's new schedule, and it expected Agra to pay that cost. On June 30 – the same day

---

[323] Ex. 199, 201, 202, 204, 206, 207, 212.

[324] Ex. 205.

[325] Ex. 204, 206.

[326] Ex. 212.

[327] Ex. 215.

100

that Agra reduced Pay App 10 – Agra demanded that Central meet the new Agra schedule while refusing to pay for any increase in Central's manpower and threatened removal of work from Central.[328]

On July 1, 2008, Central denied Agra access to the FTP site for the Plymouth Project.[329] Central contends that this occurred after Agra attempted to secure unpaid-for design drawings from Sega, Central's design contractor, and that Agra sought to do this to further its efforts to replace Agra with Wanzek. The drawings were Central's property, subject to Sega's claim.

Following the July 4th holiday weekend, Agra confirmed that it would not reconsider its $800,000 reduction of Central's Pay App 10, ostensibly because Central never supplied Agra with the requested marked up P&ID's showing the piping completed to substantiate its completion percentage. On July 7, Central demobilized and left the Plymouth site. On the evening of July 7, after Central had begun demobilizing, Agra received notice from Central that Central was suspending work at Plymouth because of Agra's handling and partial rejection of Pay App 10.[330] Central invited Agra's proposal to end the suspension. Burgess attempted to contact Myers between July 7-11, but his calls were not returned. Agra otherwise never responded to Central's request for

---

[328] Ex. 216.

[329] Ex. 219. The FTP was described as Sega's electronic storage site used to store and transfer large files and drawings electronically. Agra used this site to transfer info to Central and Sega and to see drawings. Agra experienced no problems accessing this computer site prior to July 1.

[330] Ex. 224.

a proposal to end the suspension.  Central never invoked the dispute resolution provisions under the Subcontract documents with respect to disputed Pay App 10.[331]

### 6.      **Termination and Cover**

In the wake of what it deemed to be Central's precipitous departure with its scope of work incomplete, Agra invoked the termination provisions of the Plymouth Subcontract by providing the requisite notices to Central on July 11, 2008, July 19, 2008 and July 28, 2008.  On July 11, 2008, Agra sent to Central a Notice of Removal of Scope, advising that pursuant to § 3.4.1 of the Plymouth Subcontract, Agra was removing from Central the portions of the work referred to in Agra's delay notices of June 6, 2008, and June 24, 2008.[332]  Also, on July 11, Agra gave Central the first 7-day notice pursuant to § 7.2.1 of the Subcontract for Central's default and breach in persistently failing to perform its scope of work and for demobilizing and suspending its work on July 7.[333]  Upon Central's failure to remedy the deficiencies and resume its work of the Subcontract in the ensuing 7 days, Agra issued its second 7-day notice of termination of the Subcontract on July 19.[334] On July 28, Agra gave Central final notice of termination of the Subcontract and advised Central that Agra intended to complete Central's work.[335]

Sections 7.2.1 and 3.4.1 of the Subcontract permitted Agra to retain a replacement contractor to complete the scope of Central's work and allowed Agra to charge back the cost of completion,

---

[331]  Ex. 158, Art. 6; Ex. 159, §§ 4.3 and 4.4.  The dispute resolution provisions required that work continue to be performed during the claim dispute process. Ex. 159, § 4.3.3.

[332]  Ex. 227.

[333]  Ex. 228.

[334]  Ex. 231.

[335]  Ex. 234.

102

plus a 15 percent fee, to Central. Agra retained Wanzek to complete Central's scope of work.[336]

In order to determine what piping work was unfinished, Wanzek prepared a color-coded mark-up of the P&IDs.[337] According to Wanzek's mark-up, Central had not completed 92% of its scope of work. Burgess prepared a pie chart from the process line list items within Central's scope of work.[338] This chart showed that Central had completed 58% of the line list items and Wanzek completed 38% of the line list items. Wanzek's welder and fitter report summary that it submitted with its payment applications to Agra, reflected that Wanzek laid nearly 32,000 feet of pipe in completing Central's work.[339] Burgess estimated that 75,000 to 100,000 total feet of pipe was to have been installed in the Plymouth plant by Central. Wanzek's cost to complete Central's scope of work after Central left the job totaled $4,604,610.

### 7.    Damages at Plymouth

Central claims an array of damages arising from Agra's alleged breaches of the Plymouth contract based upon five elements: the value of work completed through July 7, 2008; unreimbursed sales tax of $5,904;[340] interest at the subcontract 6% rate for late payment; demobilization at the contract rate of $17,300;[341] and extended duration costs described as costs incurred by Central for

---

[336] Wanzek was already a subcontractor on the Plymouth Project and was doing work on the dryer component of the ethanol plant, tasks that were separate from Central's task codes.

[337] Ex. 618.

[338] Ex. 621.

[339] Ex. 624.

[340] Ex. 282.

[341] Myers testified that the costs to demobilize from the site upon completion of the project were included in the lump sum Subcontract price for the project.

its remaining on the Plymouth job site after the substantial completion date, May 15, 2008 up to its demobilization and departure on July 7, 2008.[342]

Central's delay claim is predicated on its being unable to complete its Plymouth work by the subcontract completion date because of Agra's (I) untimely deliveries of vessels, equipment, and valves; (ii) incomplete predecessor work activities, particularly including concrete and structures; and (iii) late design changes reflected in the rev. 2 drawings issued June 2, 2008. Those delays both excuse Central from any delay damages asserted by Agra[343] and entitle it to damages for delay in the form of extended site duration costs at the rate of $5,994.86 per day[344] for the period from May 16 through July 7, 2008, 45 days. The extended site duration damages total $269,768.67.

Central contends that the value of its work through its last day on the job was, as set out in partially rejected and unpaid Pay App 10, $12,028,404.[345] Agra has paid $9,953,247.[346] With unreimbursed sales tax of $5,904 paid by Central for Agra's benefit,[347] the total cost of the work remaining due and unpaid is $2,481,141. Interest on this amount at the Subcontract rate of 6% through December 15, 2010 totals $349,942. Central's damage claim for the value of its work, if

---

[342] Ex. 275, Damages Summary.

[343] Ex. 159, §§ 6.2.3, 8.3.1; Ex. 158, §§ 3.4.1, 5.3.

[344] Agra did not contest Central's daily overhead rate.

[345] Ex. 208.

[346] The total paid by Agra is the amounts on applications 1 through 9. The amount of $96,138 approved in Pay App 10 has not been paid by Agra.

[347] Ex. 282.

legally supportable and if not subject to any offset, is $2,836,987. Thus, Central claims damages totaling $3,124,056 on the Plymouth project.[348]

Agra's counterclaim is based on expenses it incurred in hiring Wanzek to complete Central's scope of work pursuant to § 7.2.1 and § 3.4.1 of the Subcontract. Those provisions permit Agra to charge back to Central Wanzek's cost to complete, plus a 15% fee. Agra paid Wanzek a total of $4,604,610 to complete the work that was within Central's scope of work as of the time Central demobilized from the Plymouth Project. A 15% fee on the amount Agra paid to Wanzek to complete the work equals $690,691.

Agra incurred additional non-Wanzek costs to complete Central's scope of work in an amount equal to $817,398.[349] As of the date Central demobilized, Agra had paid to Central $9,953,247.[350] Therefore, the total that Agra paid to complete Central's scope of work was $16,065,946.[351] Based on the amended Subcontract Sum being $13,073,687 (with approved change orders), the amount Agra paid to finish Central's scope of work was $2,992,259 in excess of the amount remaining to be paid in regard to Central's Subcontract Sum.[352]

Under § 9.3 of the Plymouth Subcontract, Agra was allowed to charge Central for liquidated damages in the amount of $4,000 per day. Agra claims liquidated damages for the number of days

---

[348] $2,481,141 (value of work through July 7) + $5,904 (sales tax) + $349,942 (interest on unpaid sum) + $17,300 (demobilization costs) + $269,769 (extended duration costs) = $3,124,056.

[349] Ex. 672.

[350] Ex. 208.

[351] $4,604,610 + 690,691 + 817,398 + 9,953,247 = $16,065,946.

[352] $16,065,946 - $13,073,687 = $2,992,259.

it took Wanzek to mobilize for the job.  Agra approved a change order incorporating Wanzek's bid (thereby becoming part of the contract) to perform Central's remaining scope of work on the Plymouth Project 24 days after Central demobilized from the Plymouth Project.[353]  Thus, liquidated damages equal $96,000.

If Agra's counterclaim is legally supportable, *i.e.*, if the Court concludes as a matter of law that Central breached the subcontract when it demobilized on July 7, 2008, Agra's total counterclaim damages would be $3,088,259.[354]

## B.    Plymouth Analysis and Conclusions of Law

Unlike the Superior Project, Central never completed its scope of work or achieved substantial completion of the Plymouth  subcontract.  Central ended up demobilizing and walking off the job on July 7, 2008.  That action followed Agra's partial rejection of Central's Pay App 10.  In the Court's view, these two events are the pivotal events for determining whether a material breach of the contract was committed and by whom.

### 1.    Central's Payment Application No. 10

The Court first considers whether Agra materially breached the Plymouth subcontract by its partial rejection of Central's Pay App 10, so as to justify Central "suspending" its remaining work under the Subcontract.[355]  Agra timely exercised its right to dispute or reject Pay App 10 and gave Central written notice of its disapproval.  The Plymouth General Conditions  contemplate that Agra must accept and certify for payment the amount properly due as a progress payment.  If Agra

---

[353]  Ex. 670.

[354]  $2,992,259 + $96,000 = $3,088,259.

[355]  *See* Restatement (Second) of Contracts §§ 235, 237, 241

106

disagrees with the completion percentage and is unable to represent that Central's work has progressed to the point claimed, it is permitted to withhold approval of the payment application and issuance of the certificate for payment.[356]  Agra did exactly that.  It gave notice to Central the reasons for withholding payment, and requested additional information (*i.e.* a marked up P&ID) from Central to substantiate its claimed completion percentage.  The Plymouth General Conditions allowed Agra to make that request.[357]  Upon Central's removal of the "reasons for withholding certification," Agra could certify the amounts previously withheld for payment.[358]  Central failed to document or otherwise substantiate its completion percentage.  Agra was therefore not obligated to approve and certify Pay App 10 for payment.  Agra's conduct in partially rejecting Pay App 10 was not a breach of the Subcontract.

Nor did Agra breach the Subcontract by not remitting partial payment on Pay App 10.  The terms of payment set forth in § 11.3 of the Subcontract required Agra to make the progress payment 45 days from certification.  The Court agrees with Agra's assertion that the *earliest* payment could have been due on Pay App 10 was August 4, 2008 – and that 45 day period is calculated from the date of Central's Pay App 10, June 20.  Forty-five days from Agra's partial rejection (when Agra certified some $96,000 for payment) is August 14, 2008.  And Agra's payment obligation was limited to the $96,000 amount certified for payment on Pay App 10.  Under either payment due date, Agra's payment was not yet due at the time Central walked off the job on July 7, 2008 because of

---

[356] Ex. 159, §§ 9.4.2 and 9.5.1.  It is important to remember that Agra not only had duties to pay Central for its work, but also to accurately certify the completion of that work to Plymouth.

[357] *Id.* at § 9.3.1.

[358] *Id.* at § 9.5.2.

Pay App 10.  In any event, the failure to approve and pay Central on one of ten payment applications is not a material breach.[359]  The Court therefore concludes that Agra did not materially breach the Subcontract by not making partial payment on Pay App 10 before August 14, 2008.

The inquiry on Pay App 10 does not end here however.  Central makes the claim that Agra's partial rejection of the application constituted a breach of the implied covenant of good faith and fair dealing because it was a mere guise or sham for Agra to leverage some control over its cash flow position on the Plymouth project.  The Court therefore considers whether Agra breached its duty of good faith and fair dealing in partially denying Pay App 10.

Iowa law recognizes that a covenant of good faith and fair dealing is implied into every contract, adopting the Restatement (Second) of Contracts § 205.[360]  This duty of good faith and fair dealing applies to the performance and enforcement of a contract.[361]  While the Iowa courts have not applied this covenant in a reported case dealing with a construction contract, they have recognized

---

[359]  *See West, supra* (Failure to pay weekly salary, which was only a portion of the total compensation, was not a material breach and did not deprive the party of his contractual rights). The Court notes, however, that the evidentiary record in this matter shows that Agra never paid the $96,000 it approved on Pay App 10 and the 45 days for doing has long passed.  This is a breach (not material) and Central may claim that sum, together with the 6% rate of interest on unpaid payments, as damages.

[360]  *Engstrom v. State,* 461 N.W.2d 309, 314 (Iowa 1990).

[361]  *Id.*

its existence in commercial contract settings and other substantive areas.[362]  Iowa has adopted the

Restatement definition of good faith:

> Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party;[363]

The Iowa Court of Appeals has described the underlying principle of the implied covenant as

follows: "neither party will do anything which will have the effect of destroying or injuring the right

of the other party to receive the fruits of the contract."[364]  As further noted in that case,

> . . . generally the implied covenant of good faith and fair dealing operates upon an express condition of a contract, the occurrence of which is largely or exclusively within the control of one of the parties. *Williston on Contracts* § 38.15, at 435.  The implied covenant requires the party in control to exercise their express discretion in a manner which avoids harm to the other party.[365]

---

[362] *Pittman v. Blackhawk Rock & Gravel, Inc.,* 1999 WL 823544 at *2 (Iowa App. Oct. 15, 1999) (breach of a gravel lease); *Home Depot USA, Inc.v. Stickle Enterprises, Ltd.,* 2003 WL 24054831 at *1 (D. Iowa Aug. 14, 2003) (real estate purchase agreement to construct a retail outlet); *Horton v. Uptown Partners, L.P.,* 2006 WL 1279044 at *3, 270 N.W.2d 192 [Table] (Iowa App. May 10, 2006) (commercial lease for shopping center space); *Balins Properties, Inc. v. First Nat. Bank of West Union,* 2006 WL 2871975 at *3 (Iowa App. Oct. 11, 2006) (commercial lease); *Harvey v. Care Initiatives, Inc.,* 634 N.W.2d 681 (Iowa 2001) (wrongful termination of employment); *Johnson v. Farm Bureau Mut. Ins. Co.,* 533 N.W. 2d 203, 207 (Iowa 1995).

[363] Restatement (Second) of Contracts § 205 cmt. a, at 100 (1981); *Balins Properties, Inc., supra* at *3. *See also Kooyman v. Farm Bureau Mut. Ins. Co.,* 315 N.W.2d 30, 33 (Iowa 1982) (In the setting of an insurance contract, a covenant is implied in the contract that neither party will do anything to injure the rights of the other in receiving the benefits of the agreement.)

[364] *Horton, supra* at *3, *quoting* Williston on Contracts.

[365] *Id.*  The Iowa court cited the example of a commercial lease requiring the landlord's consent to assign the lease or sublet the lease premises.  The implied covenant prohibits the landlord from withholding consent unreasonably.

109

The Restatement states that a breach of the implied covenant of good faith and fair dealing may be shown where one party fails to cooperate with or interferes with the other party's performance.[366]

Central argues that the measure of good faith and fair dealing is a "community decency standard" found in the *Kooyman* case.[367]  *Kooyman* involved a suit against the automobile liability insurer for bad faith in representing the driver of car that hit and severely injured a child crossing the street.  After suffering a sizeable judgment against him, the insured driver assigned his claim against the insurer for bad faith in the improper handling of his defense to the child's parents.  In the underlying lawsuit against the driver, the insurer rejected a $100,000 settlement offer.  When the case went to trial, a  $1.1 million dollar verdict was entered against the driver.  In addressing the bad faith claim, the Iowa court rejected the insurer's contention that bad faith was a species of fraud and stated that it referred to a breach of the implied covenant of good faith.  It noted the comment to the Restatement (Second) of Contracts § 205:

> The phrase "good faith" is used in a variety of contexts, and its meaning varies somewhat with the context. . . . it *excludes* a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness or reasonableness.[368]

The Iowa court concluded that in the context of the insurance defense case, "bad faith" simply refers to the absence of good faith conduct that is required by the implied contract.[369]  In the context of *Kooyman*, a bad faith claim against an insurer who failed to settle the claim against its insured and exposed him to a judgment well in  excess of his $25,000 policy limits, the court suggested that the

---

[366]  Restatement (Second) of Contracts, § 205, cmt. d.

[367]  *Kooyman v. Farm Bureau Mut. Ins. Co.,* 315 N.W. 2d 30, 34 (Iowa 1982).

[368]  *Id.* at 34, quoting Restatement (Second) of Contracts, § 205, cmt. a.

[369]  315 N.W. 2d at 34.

test of good faith was whether the insurer had approached the settlement negotiations as if there were no policy limits–in other words, in an entirely objective manner.

*Kooyman* does not translate well to the instant construction contract dispute. Moreover, *Kooyman* does not establish "community decency" as the only standard for determining whether the implied covenant of good faith and fair dealing has been met, even in the insurance context.[370] In any event, the Court cannot conclude that Agra violated the "community decency standard" when it exercised its rights under the subcontract.

Moreover, the implied covenant of good faith and fair dealing is not without limits. The covenant cannot be used to override an express term of the contract.[371] Nor can the covenant be used to create new obligations or substantive terms that do not otherwise exist in the contract; rather, the covenant prevents one party from using technical compliance with a contract as a shield from liability when that party is acting for a purpose contrary to that for which the contract was made.[372]

Agra did not breach its duty of good faith and fair dealing by partially rejecting Pay App 10. Simply put, Agra's conduct did not destroy or injure Central's right to receive the fruits of the

---

[370] *See Thielen v. Aetna Cas. and Sur. Co.,* 662 N.W.2d 370 (Iowa App. 2003) (The covenant of good faith within a liability insurance policy includes the notion that neither party to the contract will do anything to injure the rights of the other in receiving the benefits of the agreement, *citing Kooyman*); *Dolan v. Aid Ins. Co.,* 431 N.W. 2d 790 (Iowa 1988) (In the insurance setting, the absence of a reasonable basis for denying benefits of the policy must be shown to establish a claim for bad faith).

[371] *Home Depot USA, Inc., supra* at *1. See also Corenswet, Inc. v. Amana Refrigeration, Inc.,* 594 F.2d 129, 138 (5th Cir. 1979) (applying Iowa law), *cert. denied,* 444 U.S. 938 (1979); *Blalock Machinery and Equipment Co., Inc. v. Iowa Mfg. Co. Of Cedar Rapids, Iowa,* 576 F. Supp. 774, 777 (D. C. Ga. 1983) (Iowa law under UCC).

[372] *Mid-America Real Estate Co. v. Iowa Realty Co., Inc.,* 406 F.3d 969, 974 (8th Cir. 2005) (applying Iowa law and predicting the limits that the Iowa Supreme Court would place on the covenant of good faith and fair dealing).

111

Plymouth Subcontract, which is the question that the Restatement formulation essentially asks in determining whether a breach of the implied covenant has occurred. At most, Agra's conduct temporarily deprived Central of payment, but this deprivation could have readily been avoided had Central come forth with the requested mark-up of the P&ID showing the piping that remained for Central to lay. It was, after all, within Central's control and its contractual obligation to support its payment application to document its right to payment.[373] In addition, Central could have invoked the dispute resolution procedures under the Subcontract and General Conditions and it did not. Because Central failed to substantiate its completion percentage, we will never know if the parties' disagreement on Pay App 10 could have been mutually resolved after the further documentation.

Agra did not wholly reject Central's application, suggesting that Agra indeed evaluated the merits of the application; it was not dismissed out of hand. Agra had questioned or challenged previous pay applications from Central, and on those occasions, Central remedied the deficiencies. There was no reason for Agra to expect a different response from Central on Pay App 10. Agra timely paid Central Pay Application Nos. 1-9, without regard for whether Agra itself had been paid by Plymouth, and at a time when Agra was lagging behind on cash flow. Only days before rejecting Pay App 10, Agra paid some $930,000 on Pay App 9. Burgess' observations which were the result of his comparison of the unfinished piping at Plymouth to the completed Superior sister project were entirely reasonable. They were supported at trial by virtually contemporaneous pictures taken of the Plymouth plant when Central left the job a week after the partial rejection of the application. Those photos speak louder than any testimony the Court heard. In addition to his visual recollection, Burgess knew of the Sr. Myers' representation in the June 27 letter that Central had "20 more weeks

---

[373] Ex. 159, § 9.3.1.

of work at our contracted pace," a statement at odds with the application and his observations. The Court heard no testimony from Myers explaining or justifying his claimed percentage (other than Agra's site superintendent Erick Soder had approved it) or why he failed to provide the requested P&ID mark-up.[374] Based on what he knew, Burgess acted reasonably in soliciting Central to substantiate its completion percentage as required by the contract. Finally, Wanzek's marked-up P&ID's when it took over Central's scope of work further substantiates Burgess' assessment of Central's claimed completion percentage. That mark-up demonstrated that Central was short of completing its work by some 32,000 feet of piping, nearly one-third of the total piping for the plant.

Central relies on Agra's field staff's approval of Pay App 10. As Central knows, however, field staff did not have final approval on payment applications and it was not uncommon for field staff and Burgess to disagree on completion percentage, as both Soder and Burgess testified. The fact that Soder and Burgess disagreed does not in itself demonstrate a breach of the duty of good faith and fair dealing. The only other evidence in Central's favor is Agra's treatment of its own payment application to the owner. Agra's inclusion of Central's work on its own payment application to the owner after denying it to Central violated the General Conditions. This certainly makes the issue of Agra's breach of the covenant a closer question.[375] But, while such conduct may breach the General Conditions and while Agra's explanation is somewhat incredible, the conduct did not interfere with or hinder Central's ability to perform its contractual obligations which is the essence of the implied covenant of good faith and fair dealing. Nor did Agra's conduct prevent

---

[374] Myers' attitude at trial about the disputed percentage was that the onus was on Agra to verify the percentage. He stated, "My feeling at this point in time is it was up to them to come out to the field and look through the information and verify it theirself [sic]."

[375] Ex. 159, § 9.3.1.2.

Central from either supplying the substantiation to Agra or invoking the dispute resolution procedures. Had it done either of those things, Central may have enjoyed the fruits of its claimed work and labors. That would have, however, required Central to continue to perform during the claim resolution process.

Central has also raised the Pay App 10 issues as a justification for its early walk-off from Plymouth, but perhaps there were other reasons that Central declined to prove up Pay App 10 with supplemental information or invoke the dispute resolution process. Central was deeply under water by the time it submitted Pay App 10. Central bid a fixed contract sum of approximately $13 million for the Plymouth project, not much more than the approximate $12 million GMP on the Superior project. Central knew how it had fared on the Superior project. It had a large unresolved and uncertain impact claim pending on Superior. It had now contracted on the Plymouth project to do more work (pipe rack work added to Central's scope of work) in less time (a contract term of approximately seven months versus the initial contract term of 11 months on Superior). Superior ended up running some 7 months past the initial completion date. The Plymouth substantial completion date had passed. Central's value of work through Pay App 10 was a little over $12 million, of which Agra had paid nearly $10 million ($11 million if Pay App 10 were approved and paid). The Plymouth project was nowhere near completion. Agra was asking Central to apply more manpower on its work to get to a revised grind date in late August. Agra refused Central's additional costs to reach the revised grind date.[376] Central's site superintendent admitted to Soder

_____

[376] As it turned out, it took Wanzek some three months to complete Central's scope of work, August-November 2008.

that Central could not get the necessary manpower to meet the schedule.[377]   Rather than take a further financial hit by staying on the project and completing the subcontract work (assuming that it could have obtained the manpower), Central simply quit; it cut its losses.  Central never explained why it failed to supply the requested documentation to substantiate its completion percentage on Pay App 10.  It had just been paid on Pay App 9, days before Pay App 10 was partially rejected and days before Central walked off.  The Court is left to wonder . . . perhaps Central knew that it was not 92% complete on its work?  Central's walk off was far more injurious to Agra's ability to complete the Plymouth project than Agra's partial rejection of Pay App 10 was to Central.

In short, the duty of good faith and fair dealing implied in contracts runs both ways.  Central had the same obligation as Agra to perform its contractual duties with good faith.  That duty included Central's obligation to accurately state its percentage of completion and to substantiate that completion percentage when requested by Agra.

The Court's independent research uncovered no reported Iowa case that is similar to the circumstances of this case.  However, the unreported Iowa case of *Pittman v. Blackhawk Rock & Gravel, Inc.*, is somewhat helpful in analyzing the parties conduct with respect to Pay App 10.[378]  In *Pittman,* the plaintiffs entered into a gravel lease with defendant that authorized the defendant to mine sand and gravel from plaintiffs' land for a royalty of $.25 per ton of gravel sold.  The lease did not require defendant to supply verifying documentation of the tonnage sold but defendant was required to weigh the gravel mined from the pit.  Plaintiffs believed that defendant underpaid them and sued for breach of contract, claiming that they were owed  for 250,000 tons of gravel defendant

---

[377]  Ex. 207.

[378]  1999 WL 823544 (Iowa App. 1999).

115

removed and sold from the gravel pit. Plaintiffs retained the services of an engineer to make calculations on the gravel pit to arrive at the conclusion that defendant had underpaid them by under-reporting the tonnage. The Iowa Court of Appeals recognized the implied duty of good faith and fair dealing imposed on each party in a contract's performance. While the plaintiffs in *Pittman* ultimately failed to meet their burden of proving a breach, the court imposed on the defendant an implied duty of good faith that imparted an obligation on defendant to furnish the plaintiff an accurate accounting and records regarding its gravel consumption.

Here, that implied covenant of good faith and fair dealing obligated Central to furnish accurate data or other documents to substantiate its completion percentage as represented on Pay App 10. It was not unreasonable for Agra to request that before approving the application. Indeed, the Subcontract documents expressly permitted it. Agra did not breach the implied covenant of good faith and fair dealing when it partially rejected Pay App 10.

## 2.    Central's Walk-off and Suspension

On July 7, 2008, four days after Agra requested additional documentation to support the completion percentage on Pay App 10, and within ten days of being paid in full on Pay App 9, Central demobilized and walked off the job. It gave notice that it was "suspending" its work later that same day, for Agra's handling of Pay App 10.[379]

Central had no right to suspend its performance under the terms of the Subcontract. Article 7 of the Subcontract contains the only specific reference to suspension of work, and that right is only bestowed Agra.[380] Nothing in Article 7 gives the subcontractor the right to "suspend" its work for

---

[379] Ex. 224.

[380] Ex. 158, § 7.3.1.

any reason.  The only term that permits the subcontractor to stop work is § 4.7.1.  That section, however, expressly limits the circumstances in which a subcontractor may stop its work to one of nonpayment.

> If the Contractor does not pay the Subcontractor *through no fault of the Subcontractor, within seven days from the time payment should be made as provided in this Agreement,* the Subcontractor may, without prejudice to any other available remedies, *upon seven additional days' written notice to the Contractor, stop the Work of this Subcontract until payment of the amount owing has been received.*  The Subcontract Sum shall, by appropriate adjustment, be increased by the amount of the Subcontractor's reasonable costs of demobilization, delay and remobilization.[381]

Even if the Court assumes that Central was without fault in connection with Pay App 10, partial payment on Pay App 10 was not due when Central "suspended" its work, as noted above.  Central did not give Agra either of the 7-day notices required by § 4.7.1.  Central did not comply with this section and cannot rely upon this Subcontract term for its suspension.

Outside of the express Subcontract terms and as noted in the introductory section of the Superior conclusions of law, nonperformance is not a breach unless performance is due.  And a nonbreaching party to the contract may only suspend its performance under the contract if the other contracting party has committed a material breach.  In short, if Agra materially breached the Subcontract by its handling of Pay App 10, Central could lawfully suspend its further performance.  As noted in the previous discussion on Pay App 10, Agra did not breach the Subcontract when it partially rejected Pay App 10.  It was entitled to request substantiation from Central of the completion percentage.  Until Central complied with that request, no further performance was due on the part of Agra.  Similarly, with respect to partial payment of Pay App 10, Agra's payment was not due under the Subcontract until August 14 – 45 days after Agra certified $96,000 for payment.

---

[381] Ex. 158, § 4.7.1 (Emphasis added).

117

As noted previously, Agra did not breach the implied covenant of good faith and fair dealing. Agra did not breach the Subcontract in its handling of Pay App 10 or by violating the covenant. In the absence of a material breach by Agra, Central was not justified in suspending its performance of the Subcontract.

By contrast, Central's July 7 walk-off and suspension of its work on Plymouth was a material breach of the Subcontract. Central failed to complete its scope of work. Examining the materiality factors in the Restatement (Second) of Contracts, §§ 241 and 242, the Court finds that Agra was deprived of the benefit of the Subcontract, the completed process piping for the Plymouth project that it contracted for with Central. While Agra may recover from Central the cost for completing Central's piping work, it can not be fully compensated for the delay and inconvenience in completing the construction project. And here, Agra is unlikely to be adequately compensated because Central's bankruptcy in all likelihood means that Agra will not be paid its completion costs. The degree which Central will suffer forfeiture by failing to complete its piping work is approximately $3 million. Of an approximate $13 million Subcontract, Central has been paid nearly $10 million. It is improbable that Central will cure its breach, especially now that it has been liquidated in bankruptcy. At the time, Central made no offers nor gave adequate assurances that it could or would re-mobilize and complete the piping job, even though Agra invited it to do so in the notices of termination. Central's sudden walk-off, without going through the dispute resolution process or substantiating its completion percentage on Pay App 10, delayed and hindered Agra's ability to complete the Plymouth project and increased its costs.

This behavior does not comport with the standards of good faith and fair dealing. Every day that passed without Central on the job delayed Agra's ability to complete the project while it

118

scrambled to line up Central's replacement. Nearly a month passed before Agra was able to bring on Wanzek to complete the tasks, a delay valued under the Subcontract at $96,000 in liquidated damages.

Finally, the Subcontract provided for performance without delay. The Subcontract contained a time of the essence provision.[382] It called for a substantial completion date of May 15, 2008. To the extent Central contended that its performance was impeded by predecessor work activities and late delivery of valves and vessels, Central could have put Agra on notice thereof and obtained an extension of the substantial completion date by executed change order.[383] Central had 3 days after a delaying event to give notice to Agra in order to increase the contract time.[384] Other than the 14 days by which the substantial completion date was extended, no other extensions of the contract time were obtained according to the change order log on the Plymouth project.[385] In the absence of any further increase in the contract time, Central's work was to be completed by May 29. That obviously did not occur.

--------

[382]  Ex. 158, § 9.4.

[383]  Ex. 158, §§ 5.2, 5.3 and 9.5. Central certainly had experience in giving delay notices and making delay claims for late predecessor activities and late delivery of valves and equipment in the Superior project and did so frequently. *See* Ex. 589.

[384]  Ex. 158, § 3.4.1. Central waived its right to an extension of its time to complete its work if it failed to give timely notice of a delay caused by Agra's neglect or default.

[385]  Ex. 595. Prior to the substantial completion date, only one change order was sought and submitted to extend the contract time 3 days. See Change Order 2 submitted February 8, 2008. The change order log reflects that change order 2 was denied. The next change order to increase the contract time did not occur until June 11, Change Order 17. Five change orders were submitted June 11 that were approved and extended the completion date 13 days. Change order 24 submitted June 19 was approved and extended the contract time 1 day.

119

Central's failure to complete its scope of work on Plymouth and its suspension was a material breach that justified Agra's termination of the Subcontract. Agra gave the appropriate termination notices to Central under § 7.2.1 of the Subcontract.[386]

### 3.      Agra's Damages

Agra is entitled to charge back to Central the costs it incurred to complete Central's unfinished scope of work, together with a 15% fee.[387] Agra hired Wanzek as the replacement subcontractor to complete the piping work, but also incurred costs to others for materials and labor to complete Central's work. Agra paid Wanzek $4,604,610 to complete Central's unfinished scope of work and a 15% fee on that amount yields $690,691. The non-Wanzek costs to complete Central's work equaled $817,398. Thus, the total completion costs incurred by Agra to finish Central's scope of work was $6,112,699 and the amount paid by Agra to Central prior to its suspension and walk off was $9,953,247 for a total cost of Central's scope of work equal to $16,065,946. The amended fixed Subcontract Sum (with approved change orders) for Central's scope of work was $13,073,687. Thus, the amount Agra paid to finish Central's scope of work was $2,992,259 in excess of the Subcontract Sum to be paid Central had it remained on site and completed its scope of work.

In addition to the $2.9 million completion costs charged back to Central, it was also liable for liquidated damages under § 3.4.1 and § 9.3 of the Subcontract at the rate of $4,000 per day. Agra is entitled to liquidated damages for the 24 day period from July 7, the date Central walked off the

---

[386] Ex. 228, 231, 234.

[387] Ex. 158, §§ 7.2.1 and 3.4.1.

120

job, to July 31, the date Wanzek's change order (to complete Central's work) was approved and became part of the Subcontract. Thus, Agra is entitled to liquidated damages of $96,000.

The total damages incurred by Agra as a result of Central's material breach are $3,088,259.

### 4. Agra's Breaches and Central's Claims

While Central's material breach of the Subcontract will bar its right to recover the majority of its claimed damages, it may be entitled to recover damages against Agra for breaches of the Subcontract that occurred prior to Central's material breach and walk-off. The Court addresses the components of Central's damages claim.

### a. Demobilization

The undisputed evidence at trial was that the demobilization costs of $17,300 were included in the lump sum Subcontract price. If Central had completed its scope of work and thereafter demobilized, it would not have been entitled to recover these demobilization costs above and beyond the Subcontract lump sum. Section 4.7.1 speaks to the subcontractor's right to stop work for a contractor's nonpayment until the subcontractor receives the payment.[388] It further provides that if the subcontractor demobilizes as a result of nonpayment and then returns to the job after receiving payment, these "extra" demobilization and remobilization costs may be recovered. Here, however, Central did not suspend its work and demobilize because of nonpayment by Agra; it suspended and demobilized because Agra partially rejected Pay App 10. Because this Court has concluded that Central's suspension and demobilization was a material breach of the Subcontract, Agra's obligation to pay these demobilization costs was discharged. In any event, Central did not comply with the

---

[388] The Court concludes here that Central is not "faultless" in Agra's nonpayment of the full amount under Pay App 10, a condition to stoppage of the work. *See* Ex. 158, § 4.7.1.

121

notice requirements to invoke § 4.7.1 and Central did not incur an "extra" demobilization that is contemplated by that section; it left July 7 with its scope of work incomplete and never returned to the site. Central is not entitled to recover the demobilization costs under these circumstances.

b. Pay App 10

Agra has timely paid Central's Payment Application Nos. 1-9. With respect to Pay App 10, however, Agra has never paid the partial amount it certified for payment, $96,138. This nonpayment of Pay App 10 is a non-material breach of the Subcontract. Agra certified that amount for payment on June 30, 2008, fixing its payment obligation prior to Central's material breach of the Subcontract on July 7 that discharged future performance by Agra. Payment was due August 14, 2008 pursuant to the progress payment terms at § 11.3 of the Subcontract. Central is therefore entitled to recover the sum of $96,138, together with interest accruing at the rate of 6% per annum from August 15, 2008 until paid per the Subcontract.[389]

c. Unreimbursed Sales Tax

Central also claims the sum of $5,904 for sales tax it paid on Agra's behalf that Agra has not repaid. It does not appear that Central ever submitted a claim for this amount or obtained an executed change order for the unreimbursed sales tax to effect a modification to the amount of the Subcontract Sum. In the absence of a change order, Central is not entitled to recover this additional sum.

d. Value of the Contract

Central claims that it is entitled to recover the total cost of its work remaining due and unpaid under the Subcontract, some $2.481 million. Central materially breached the Subcontract

---

[389] Ex. 158, § 15.2.

by its improper suspension of the work and failure to achieve substantial completion.  That material breach bars Central's right to recover the remaining balance of the contract.  Because Pay App 10 was not fully certified for payment because of the percentage completion discrepancy, Central is not entitled to recover the full amount on this application.  No further applications for payment were submitted by Central and certified by Agra for payment.  Thus, the amount of the Subcontract Sum that Central would be entitled to recover is the amount of Payment Application Nos. 1-9 certified for payment ($9,953,247) and the $96,138 certified for payment on Pay App 10, or a total of $10,049,385.  Agra has paid all of this sum except for the $96,000 on Pay App 10, which the Court has previously allowed.  Central is not entitled to any further recovery under the Subcontract.

e.      Delay Claim/Extended Duration

Finally, the Court considers Central right to recover its delay claim for extended duration costs, the time and overhead while Central was on the job after the substantial completion date until its departure on July 7, some $269,768.  The heart of the dispute here between Central and Agra is whether the delays asserted by Central that were outside Central's control and attributable to Agra (*i.e.* late deliveries of valves and vessels and late predecessor activity) prevented Central from completing its work by the date for substantial completion.  Central contends that they did.  Agra contends that even with the delays, Central could have achieved the substantial completion date had it properly manned the project and that Central could have worked in other plant areas when there were delays.  In addition, Agra contends that Central did not follow the delay notice and claim procedures in the Subcontract.

In the absence of obtaining an extension of the substantial completion date, Central was obligated to perform its scope of work within the time allotted.  Thus, it is important to ascertain

123

whether Central properly obtained an extension of the substantial completion date and the time for it to perform its work. The Subcontract provides at § 3.4.1 that Central had three (3) days from the event that delayed its performance to give written notice of the delay to Agra and the reason for the delay. Importantly, Central lost the ability to extend the deadline for its performance if it did not give timely delay notice: "Failure to give timely notice shall be deemed to waive extension of time for the Subcontractor to perform its obligation(s) under this agreement."[390]

Central submitted a total of five delay *claims* on the Plymouth project between March 25, 2008 and May 30, 2008.[391] Even if the Court gives the benefit of the doubt to Central and construes these letters as Central's delay notice, four of the five show on their face that Central gave delay notice well beyond three days from the delaying event.[392] Thus, as to these "delay claims," Central waived its right to extend its time to perform the Subcontract work. Central also failed to make a timely delay claim (for costs and damages) with respect to these four claims, as it was required by the General Conditions to make its claim within 21 days of the occurrence of the event giving rise to the claim.[393] On their face, these delay claims show that the claim was made more than 21 days of the delaying event.

---

[390] Ex. 158, § 3.4.1.

[391] Exs. 186-A, 186-B, 186-C, 191, 199.

[392] Ex. 186-A is a delay claim dated March 25, 2008 for a delaying event that occurred on March 10, 2008. Ex. 186-B is a delay claim dated March 25, 2008 for a delaying event that occurred on February 23, 2008. Ex. 186-C is a delay claim dated April 11, 2008 for a delaying event that occurred on January 11, 2008. Ex. 191 is a delay claim dated April 29, 2008 for late delivery of valves beyond January 17, 2008.

[393] Ex. 159, §§ 4.3.2, 4.3.7.1, and 8.3.1.

That leaves Central's remaining "delay claim" dated May 30, 2008, after the substantial completion date.[394] Although not delineated as a delay claim, it clearly is Central's "notice of a claim for extended site overhead costs and other damages related to the project delay." The Court questions the timeliness of this claim as well, particularly when Central represents that completion is "obviously several months away." There is no evidence that Central awakened one day after the extended substantial completion date to an epiphany that it was not going to complete its work by the deadline. Given Central's representation on May 30, 2008 that completion was several months away, the Court concludes that Central did not make its claim within 21 days of realizing that it was going to be on site for several months past the substantial completion date. Moreover, it did not give notice to Agra of the amount of the additional costs that Central was claiming, let alone a daily overhead rate.[395] Nor did it submit or obtain a change order for its $270,000 sought for extended duration costs. Accordingly, the Subcontract Sum was not properly modified and Central is not entitled to recover the extended duration costs it now claims.

## VI.    SUMMARY

### A.    Superior Project

Agra committed a partial breach of the Subcontract when it failed to pay Central the remaining balance of the adjusted GMP. Central is awarded judgment in the principal amount of $301,914, together with interest at the rate of 6% per annum from and after August 14, 2008. Central is further awarded judgment in the amount of $5,108.48, representing 6% interest on Agra's

---

[394]   Ex. 199.

[395]   Ex. 159, §§ 4.3.5, 4.3.6

late progress payments.[396]  Finally, Central is awarded judgment for its unpaid costs of its work on the water treatment facility, in the amount of $242,535.  Central failed to meet its burden of proof on the remainder of its damage claims and they are therefore denied.

Agra failed to meet its burden of proof on its $269,000 counterclaim for back charges for its cost of repairing Central's work.

## B.    Plymouth Project

Central materially breached the Subcontract by its July 7, 2008 suspension, demobilization and "walk off" with its scope of work incomplete.  Agra is awarded judgment in the amount of $2,992,259, its cost to complete Central's scope of work.  Agra is also awarded judgment in the amount of $96,000 as liquidated damages under the Subcontract.  Thus, the total damages incurred by Agra as a result of Central's material breach are $3,088,259.

Central is awarded judgment in the amount of $96,138, together with interest accruing at the rate of 6% per annum from August 15, 2008 until paid, for Agra's payment breach on the approved portion of Central's Payment Application No. 10.

## C.    Setoff

The Court concludes that this case is an appropriate one for setoff under 11 U.S.C. § 553.  Agra may be entitled to setoff if:  (1) it is indebted to Central and that debt arose prior to the commencement of the bankruptcy case; (2) Agra has a claim against the debtor that arose prior to the commencement of the bankruptcy case; and (3) the debt and the claim are mutual obligations.[397]

---

[396]  Ex. 271.

[397]  *In re Allen,* 135 B.R. 856, 860 (Bankr. N.D. Iowa 1992); *In re Davidovich,* 901 F.2d 1533, 1537 (10th Cir. 1990).

126

Here, Agra is indebted to Central on the Superior and Plymouth Subcontracts and those debts arose in 2008 when Agra failed to pay Central the balance of its guaranteed maximum price under the Superior Subcontract and failed to pay Central the approved amount of payment application 10 on the Plymouth project. Agra has a breach of contract claim against Central on the Plymouth Subcontract and that claim arose in 2008 when Central suspended its performance and walked off the job without completing its work under the subcontract. Central filed its bankruptcy petition in 2009. The debt and the claim are mutual obligations in that they both arise out of piping subcontracts between Agra and Central for the construction of ethanol plants in Iowa. Agra and Central are the parties to both of those subcontracts. The debts involved are between the same parties standing in the same capacity. Agra may setoff the amount of its debt to Central on the projects as established in this opinion, leaving a net judgment and claim in favor of Agra.

###	D.	Attorney's Fees

Central has previously signaled its intent to seek attorneys' fees under the Superior Subcontract should it prevail on its claims. The Terms and Conditions authorize "the substantially prevailing party" to recover its reasonable costs, expenses and attorneys' fees.[398] Central would be hard-pressed to claim "victory," either on the Superior Subcontract, or the case as a whole. Central was awarded judgment for the unpaid balance of the subcontract, some $302,000; its unpaid costs for its work on the water treatment building, some $242,000; and $5,100 in interest on late progress payments, for a total award of approximately $550,000. Neither the interest calculation nor the subcontract balance were vigorously contested by Agra. Central did not prevail on the largest component of its breach of contract claim – a $1.134 million impact claim. Central's total recovery

---

[398] Ex. 4, § A.13.13.1, p. 41.

on the Superior Subcontract is less than one-third of the damages it sought.   Under these circumstances, Central was not the "substantially prevailing party."   In addition, Central's $3 million breach of the Plymouth Subcontract more than offsets its Superior recovery.

### E.  Post-Trial Motions

The Court heard two weeks of evidence and has spent several months reviewing and evaluating the record in this case before the reaching the results set out here.   Therefore, the parties are admonished to review carefully the appropriate standards for granting post-trial and post-judgment relief before filing any post-trial motions in this case.   Any such motions and responses thereto shall be limited in length to ten (10) pages, including the case caption, citations to the record, and the signature page.   Such motions shall not be set to the Court's regular motions docket.   Upon receipt of a motion and timely response, the Court will take the matter under advisement and issue a ruling.

### F.  Judgment

A Judgment on Decision shall issue this day.


IT IS SO ORDERED.

# # #